## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND  DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  Civil Action No. |
| | ) |
| **KELLOGG BROWN & ROOT SERVICES, INC.;** | ) |
| **KELLOGG BROWN & ROOT LLC; OVERSEAS** | ) |
| **ADMINISTRATION SERVICES, LTD.;** | ) |
| **FIRST KUWAITI CO.; FIRST KUWAITI TRADING** | ) |
| **COMPANY; FIRST KUWAITI TRADING AND** | ) |
| **CONTRACTING; FIRST KUWAITI GENERAL** | ) |
| **TRADING & CONTRACTING COMPANY; FIRST** | ) |
| **KUWAITI GENERAL TRADING & CONTRACTING** | ) |
| **COMPANY, W.L.L.; FIRST KUWAITI TRADING &** | ) |
| **CONTRACTING, W.L.L.; and FIRST KUWAITI** | ) |
| **GENERAL CONTRACTING & TRADING** | ) |
| **COMPANY, W.L.L.,** | ) |
| | ) |
| **Defendants.** | ) |

## FIRST AMENDED COMPLAINT OF
## THE UNITED STATES OF AMERICA

The United States of America brings this action against the defendants, prime contractor

Kellogg Brown & Root Services, Inc. (KBR) and subcontractor First Kuwaiti Trading Company

(First Kuwaiti), for knowingly inflating the cost of delivering and installing living trailers to

house American troops in Iraq under LOGCAP III – a contract between the United States Army

and KBR for logistical support in the military theater.  The United States asserts that this conduct

gives rise to claims against KBR and First Kuwaiti under the False Claims Act, 31 U.S.C.

§ 3729, and against KBR under the Contract Disputes Act, 41 U.S.C. § 7103(c)(2), and at

common law for breach of contract.  For its First Amended Complaint, the United States alleges as follows:

## Jurisdiction and Venue

1.       Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1345.

2.       The Court has personal jurisdiction over the defendants because KBR and First Kuwaiti transact or transacted business in the United States and one or more of the acts proscribed by 31 U.S.C. §3729 occurred in the United States.

3.       Venue is proper in this district under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because defendant KBR is doing business in this district, defendant First Kuwaiti did business in this district, and at least one of the acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## The Parties

4.       Plaintiff is the United States of America.

5.       The defendants identified in this paragraph are referred to collectively as KBR:

a.       The Army awarded the LOGCAP III contract to Brown & Root Services, a division of Kellogg Brown & Root, Inc., in December 2001.  At the time, Kellogg Brown & Root, Inc. was owned by Halliburton Company (Halliburton), which guaranteed performance of LOGCAP III.  On December 14, 2003, responsibility for LOGCAP III was transferred to defendant Kellogg Brown & Root Services, Inc., also owned by Halliburton.  In April 2007, Halliburton spun-off its KBR subsidiaries, as KBR, Inc., a publicly-traded stock company.

As discussed in the allegations below, the acts attributed to KBR before December 14, 2003, were committed by Kellogg Brown & Root, Inc. and its agents; the acts attributed to KBR on or after that date were committed by Kellogg Brown & Root Services, Inc. and its agents.

b.      Defendant Kellogg Brown & Root LLC, successor to Kellogg Brown & Root, Inc., is a Delaware corporation with its principal office and place of business located at 601 Jefferson Street,  Houston, Texas 77002, and its registered agent for service is CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas Texas 75201.  At all times relevant to this complaint, Kellogg Brown & Root LLC owned Kellogg Brown & Root Services, Inc.; Brown and Root Services, a division of defendant Kellogg, Brown & Root International, Inc., and predecessor or successor related corporations.

c.      Defendant Overseas Administration Services, Ltd. (OAS) employed most of KBR's administrators working on LOGCAP III in Iraq and Kuwait at all times relevant to this complaint.  Upon information and belief, OAS was incorporated in the Cayman Islands, headquartered in Dubai, and is a foreign, wholly-owned subsidiary of defendant Kellogg Brown & Root LLC.  KBR Technical Services, Inc., is a domestic subsidiary of Kellogg Brown & Root LLC and recruited and trained employees for OAS.  During the time relevant to this complaint up to April 2007, the employees of OAS and other defendant KBR entities were trained using Halliburton's personnel and procedure manuals, received employment benefits through Halliburton's human resources organization, and conducted email correspondence through the Halliburton.com network.

6.      The defendants identified in this paragraph are referred to collectively as First Kuwaiti:  KBR awarded defendant First Kuwaiti Co. a subcontract under LOGCAP III for the delivery of living trailers to house American troops in Iraq.  First Kuwaiti Trading Company, First Kuwaiti Trading and Contracting, First Kuwaiti General Trading & Contracting Company, First Kuwaiti General Trading & Contracting Company, W.L.L., First Kuwaiti Trading & Contracting, W.L.L., First Kuwaiti General Contracting & Trading Company, W.L.L., all named as defendants, were various names used by First Kuwaiti Co. and  General Manager Wadih M.

Al-Absi (Al-Absi) on documents relating to the subcontract.  Upon information and belief, First

Kuwaiti Co.'s and Al-Absi's principal place of business is Sharq, Ahmed Al-Jaber Street, Al-Jas

Tower, 8th floor, Kuwait City, Kuwait.

**Factual Allegations**

## I.      The LOGCAP III Contract

7.      On December 14, 2001, the Army awarded contract number DAAA09-02-D-

0007, known as LOGCAP III, to Brown and Root Services, a division of Kellogg Brown &

Root, Inc.  LOGCAP III is the third generation of contracts under the Army's Logistics Civil

Augmentation Program for the provision of logistical support in the military theater.  Support

services include transportation, dining, facilities management, maintenance, and living

accommodations for the troops.

8.      LOGCAP III is an umbrella contract for an indefinite delivery of an indefinite

quantity of services, known as an IDIQ contract.  IDIQ contracts operate through task orders,

each of which prescribes a specific scope of work.

9.      The Government pays KBR for its actual cost of providing the services required

by each task order, plus a one percent base fee and a discretionary award fee of up to two

percent.

10.      KBR performed a significant portion of its obligations under LOGCAP III

through subcontractors.  These subcontractors invoice KBR for the services they provide under

their subcontracts with KBR.  KBR, in turn, vouchers the Government for its costs under the

subcontracts, plus overhead and general and administrative expenses, plus the one percent base

fee.

## II.      The Bed Down Mission and the Award of Subcontract 11 to First Kuwaiti

11.      On August 27, 2003, the Army issued Change 5 to the Statement of Work for

LOGCAP III, Task Order 59.  The change included requirements for the Bed Down Mission,

which was a push to replace the tents used to house the troops in the early days of the Iraq

conflict with more comfortable living trailers and living containers.

12.      Change 5 made clear the "Commander's intent to rapidly bed down" the troops

by establishing deadlines for completion of the mission camp-by-camp:

> The contractor shall provide accommodations and life support
> services to CJTF-7 and coalition forces in various locations in Iraq.
> . . . It is the Commander's intent to rapidly bed down the
> remainder of CJTF7 [*sic*] soldiers . . . .

Change 5, Section 1.0.

13.      Pertinent here, Change 5 required KBR to "provide, setup, operate, and maintain"

2,252 living trailers at Camp Anaconda in Iraq, no later than December 15, 2003.  Change 5,

Section 8.2 and Appendix A.

14.      On October 16, 2003, KBR awarded subcontract number GU84-VC-SO00011

(Subcontract 11) to First Kuwaiti to provide, deliver, and install 2,252 trailers at Camp

Anaconda no later than December 15, 2003, for $80,978,562.

15.      By its terms, Subcontract 11 placed the risk of any increased cost due to war zone

delays on First Kuwaiti.

a.      First, the subcontract provided that in the event of delays by force

majeure, First Kuwaiti would not be entitled to more compensation:

> In the event Subcontractor is delayed by force majeure, Sub-
> contractor shall be entitled to an equitable adjustment in time for
> performance **but no adjustment in compensation shall be due**.

Subcontract 11, General Conditions, ¶ 3.2.6 (Time, Schedule, and Delays) (emphasis added).

      b.     Second, the subcontract required First Kuwaiti to complete delivery and installation of the trailers at Camp Anaconda no later than December 15, 2003, making allowances "for delays in convoy coordination and support."  Subcontract 11, Subcontract Terms, ¶ 4.1 (Time of Performance).  According to KBR Claims Group counsel David Brenner, "it is clear that [this clause] means that allowances for additional time may be made in case of delay, and not that financial compensation will be paid."  Letter from David Brenner (Dec. 22, 2005) (interpreting the identical clause in a related subcontract).

16.     First Kuwaiti's proposed price was the second highest of the companies bidding to provide the trailers.  The reason First Kuwaiti's price was so high was because it covered the cost of delivering the trailers into Iraq and installing them at their destination, not just the price of the trailer unit procured from the manufacturer, which was Red Sea Housing Services Co., Ltd. (Red Sea).  For example, Red Sea's proposed unit price for a 2-person, 1-bath trailer was $19,000, while First Kuwaiti's proposed price was $39,416, but First Kuwaiti's price included $4,500 for "Transportation," $2,756 for "Civil Works," $5,980 for "Electrical Net Works" (sic), and $7,360 for "Black, Gray, Fresh water networks."  Thus, First Kuwaiti's price, which included delivery and installation, was about double Red Sea's price for the unit alone ($39,416 versus $19,000).

17.     KBR justified First Kuwaiti's price both internally and to the Government based, in part, on First Kuwaiti's commitment to assume the risk of any increased cost due to the delays inherent in delivery and installation in a war zone, including waiting for military convoys to escort the trucks transporting the trailers from the Kuwait-Iraq border to Camp Anaconda inside Iraq.

      a.     In a March 31, 2005 KBR internal memorandum, KBR explained that it was more cost effective to have First Kuwaiti "purchase the units [from manufacturer Red Sea],

**transport them and assume the risk** and to install them at the site required," than for KBR to purchase them directly from the manufacturer at a much lower price (emphasis added).

        b.     In April 2005, KBR responded to a request by the Defense Contract Audit Agency (DCAA) to justify the purchase of trailers from First Kuwaiti, rather than directly from Red Sea.  KBR justified the higher price because "the Red Sea containers [pricing] does not include furnishing, shipping, assembly or set-up on location in Iraq.  These services were included in First Kuwaiti's prices."

        c.     In a June 21, 2005 letter to DCAA, KBR repeated that "costs related to prolonged delays at border crossings" were included in the original price of Subcontract 11.

> The "Transportation" charge [as proposed by First Kuwaiti (see paragraph 16 above) and included in the original subcontract price] is related to fuel, truck leases, driver meals, fees[,] taxes, driver salary, maintenance and repair of vehicles, and delivery. **Transportation covers** all movement costs and **costs related to prolonged delays at border crossing sites.**  [Emphasis added.]

    18.    KBR and First Kuwaiti knew at the time the subcontract was awarded that First Kuwaiti could not meet the December 15, 2003 deadline for delivery and installation.  KBR and First Kuwaiti knew that First Kuwaiti could not meet the deadline because Red Sea had provided its production schedule to First Kuwaiti before subcontract award and that same day First Kuwaiti forwarded the information to KBR.  Based on Red Sea's schedule, KBR and First Kuwaiti knew in September 2003, that Red Sea could manufacture and deliver only 1,645 living trailers to the border by December 15, 2003 – far short of the 2,252 units LOGCAP III and Subcontract 11 required to be delivered **and installed** at Camp Anaconda by that date, as explained more fully in paragraphs 56 - 62 below.

### III.    First Kuwaiti's Requests for an Equitable Adjustment

19.    Despite the terms of its subcontract, First Kuwaiti presented KBR with several requests for an equitable adjustment of the subcontract price due to delays.  A request for equitable adjustment (REA) is a claim by a contractor that it is entitled to an adjustment of the contract price (here, the price of Subcontract 11).  An REA based on delay must be supported by evidence that the delay was unforeseeable and caused solely by the Government.

###     A.    The Double Handling REA

20.    In May and June 2004, First Kuwaiti presented KBR with four REAs for "repair costs and double handling" due to alleged Government-caused delay.  First Kuwaiti contended that, as a result of Government-caused convoy delays and delays in site preparation, First Kuwaiti had to unload the trailers at temporary storage locations along the Kuwait-Iraq border, reload them onto flatbed trucks for delivery to the destination camp once convoys became available, unload them at temporary storage areas at the destination camp because final installation sites were not ready, and reload them again to move them from the temporary storage areas to their final installation sites.  First Kuwaiti contended that the repeated unloading and reloading required it to lease land, cranes, and other equipment, and to hire personnel it otherwise would not have needed (the double handling costs) and that the increased handling resulted in damage to the trailers that First Kuwaiti had to repair (the repair costs).  First Kuwaiti initially claimed $33,767,978 in repair and double handling REAs, but later consolidated its claims into a single REA for $30,638,102 (for simplicity, referred to here as the "Double Handling REA").

1. **First Kuwaiti and KBR Knew That First Kuwaiti's Double Handling Costs Were Inflated**

21.     On December 27, 2003, Lieutenant Colonel Damon T. Walsh, U.S. Army, Administrative Contracting Officer (ACO)/Commander, Defense Contract Management Agency (DCMA), issued a Letter of Direction (LOD) to KBR "to authorize KBR to explore the feasibility of leasing sufficient property in Kuwait to facilitate the temporary storage of trailers being delivered to Iraq . . . ."  Walsh further directed KBR:  "For planning purposes, prepare the estimate based on a 90 day lease . . . KBR will need to provide me an estimate before entering into any leasing agreements in furtherance of this LOD."

22.     On December 29, 2003, KBR Subcontract Administrator Jakob Matovinovic requested a land lease price from First Kuwaiti.

23.     On December 30, 2003, First Kuwaiti responded with a price proposal for leasing land and conducting operations at a temporary storage yard at the border during the ensuing three months.  The proposal included $200,000 a month to lease 200,000 square meters of land at $1 per square meter, as well as prices for cranes and other equipment "for off-loading, shifting & unloading of material."  As quoted by First Kuwaiti, the total price for the land and temporary storage operations was $647,500 a month.  KBR incorporated the $647,500 monthly rate into its Material Requisition, which KBR intended to present to ACO Walsh for approval.

24.     In an internal email, KBR described First Kuwaiti's proposed price (as included by KBR in its Material Requisition) as "exorbitant."  In another email on January 3, 2004,Jay Patterson, a KBR Government operations administrator, advised that First Kuwaiti had been told "the price is too high" and they (KBR) were waiting for "a reasonable price":

> James [Ray, KBR Regional Lead Contract Administrator] has told
> them [First Kuwaiti] the price is too high (as we have all said),
> LTC Walsh agreed.  Waiting from them to come back with a
> reasonable price.

Patterson copied his email to Matovinovic and KBR Procurement, Materials, and Property

Manager for Iraq Donald D. Bailey.

25.     On January 3, 2004, at 6:52 p.m., Patterson emailed Matovinovic, Bailey, KBR

Material Control Supervisor Bret A. James, and KBR Quality Assurance Manager Mac Pitts,

stating that the responsible parties would not approve the Material Requisition "until they

receive a reasonable price":

> The req is being held by [KBR Project Manager] Mike
> Mulholland.  Neither Mike Mulholland, James Ray or Damon
> Walsh will sign it until they receive a reasonable price . . . . the
> persons that would be responsible for issuing and acting on it are
> the ones holding the requisition.

26.     Approximately an hour later, Bailey replied agreeing that the price was

"unreasonable" and stating that KBR's Material Requisition should be based on a "fair price,"

not the subcontractor's price:

> Let me handle this . . . I will work with First Kuwaiti and get a
> reasonable price, period! . . . . But I agree the price is
> unreasonable, but everyone knew what was taking place.  So the
> requisition should [be] complete[d] with what they think is [a] fair
> price . . . Requisitions aren't supposed to be filled out based on the
> subcontractor's price anyway.

Bailey made handwritten changes to the Material Requisition, reducing the price from $647,500

a month (as quoted by First Kuwaiti in its December 30, 2003 proposal) to $115,000 a month.

KBR's revised Material Requisition was approved by Patterson and Mulholland on January 9,

2004, and signed by ACO Walsh three days later.

27.     As explained below, KBR later agreed to settle First Kuwaiti's Double Handling

REA for more than the "exorbitant" and "unreasonable" prices proposed by First Kuwaiti on

December 30, 2003.

28.     As part of its claim for double handling costs, First Kuwaiti represented that it had to lease five extra cranes at its Kuwait staging area at the Iraq border for eight months, five extra cranes at Camp Anaconda for eight months, and four extra cranes at Camp Victory for six months, for a total of 14 cranes.  (Camp Victory was added to the scope of work by a change order.)  In its initial REA, First Kuwaiti claimed $20,000 a month for each crane.  When KBR requested that First Kuwaiti submit a revised REA breaking down its costs in more detail, First Kuwaiti increased the price of each crane to $23,000 a month.  No explanation was provided for the increase.

29.     On July 10, 2004, while Matovinovic was acting on First Kuwaiti's Double Handling REA, James emailed Matovinovic First Kuwaiti's December 30, 2003 proposal to use as a "barometer" to compare against the REA.  Based on the crane price in the December 30, 2003 proposal ($12,000 a month), both First Kuwaiti and KBR knew that the $23,000 a month claimed by First Kuwaiti for each crane in its REA was inflated.

30.     In fact, even the lower price in the proposal exceeded the actual rate paid by First Kuwaiti, as reflected in the crane leases.  First Kuwaiti paid only $8,250 a month per crane for most, if not all, of the cranes.  This rate is documented by lease agreements for 11 of the 14 cranes.  Based on these agreements, First Kuwaiti paid 2,500 Kuwaiti dinars a month, which equates to $8,250 a month at the relevant exchange rate.

31.     Consequently, First Kuwaiti's crane costs were inflated by about $14,750 a month, or nearly 280 percent, for each crane.  This number is derived by comparing First Kuwaiti's actual cost as reflected in the leases ($8,250 a month) to the cost claimed in its REA ($23,000 a month).

32.     First Kuwaiti provided the leases to KBR Senior Manager for Government Compliance, Theodore E. Needham, III on December 21, 2006.  Therefore, KBR knew no later

than December 21, 2006, that First Kuwaiti's actual cost per crane was $8,250 a month or less. Even before that date, KBR had First Kuwaiti's December 30, 2003 proposal quoting $12,000 a month per crane as sufficient to cover the cost of the lease and associated expenses and burdens.

33.     Despite repeated requests by Government officials for First Kuwaiti's actual costs, KBR withheld the crane leases from the Government until May 11, 2012, and the the December 30, 2003 proposal and related emails until October 18, 2012.

34.     First Kuwaiti similarly inflated other costs in its Double Handling REA over the proposed charges in its December 30, 2003 proposal including, but not limited to, costs for land rental, flatbeds, loaders, forklifts, and personnel, as KBR knew.

### 2.     First Kuwaiti and KBR Settled the Double Handling REA at an Inflated Price and KBR Billed the Government

35.     KBR concluded that between one-third and one-half of the repair costs claimed in the consolidated Double Handling REA were unjustified inasmuch as First Kuwaiti appeared to be double charging for labor and equipment, claiming reimbursement for "punch list" repairs (repairs needed because of manufacturing defects, rather than damage due to double handling), overstating the number of repairs actually performed, and overstating the material needed to make the repairs.  In a July 14, 2004 email to First Kuwaiti General Manager Wadih M. Al-Absi, Matovinovic advised First Kuwaiti that KBR was willing to "settle" First Kuwaiti's repair costs for 25 percent less than First Kuwaiti had claimed, but First Kuwaiti would have to accept the offer "ASAP."  Otherwise, Matovinovic told Al-Absi, he (Matovinovic) would refer the REA to KBR's "claims team."  In other words, Matovinovic was threatening First Kuwaiti that if it did not accept KBR's offer to pay 25 percent less for the repairs than First Kuwaiti's claimed cost, KBR's claims team would require First Kuwaiti to support the claim and would limit any price adjustment to First Kuwaiti's actual cost, consistent with the terms of Subcontract 11.

Matovinovic made this offer even though he believed that one-third to one-half of the claimed repair costs were unjustified or false.

36.     Soon afterward, KBR and First Kuwaiti settled the $30,638,102 Double Handling REA for $23,831,147.25, including millions of dollars more than First Kuwaiti's actual crane costs and more than the amount KBR's independent estimator believed the repairs should have cost.

37.     On August 1, 2004, KBR executed Change Order 7 to Subcontract 11, reflecting the $23,831,147 increase in the subcontract price for the Double Handling REA.

38.     In September 2004, KBR billed the Government, and the Government paid, $23,831,147 for KBR's costs attributable to First Kuwaiti's Double Handling REA, plus related fees and costs.

**B.    The Delay REA**

39.     On July 15, 2004, First Kuwaiti presented KBR with an REA for increased truck and driver costs due to alleged Government-caused delay (the Delay REA).  First Kuwaiti initially claimed $62,956,500 based on 83,942 days of idle truck and driver time at $750 a day for each idle truck and driver.  The claim attributed all delay days allegedly experienced by First Kuwaiti to Government-caused delays; no delays were attributed to KBR, First Kuwaiti, or force majeure.

40.     On July 16, 2004, Matovinovic emailed KBR Senior Subcontract Administrator Charles T. Hutchins and others regarding the Delay REA, stating that First Kuwaiti "is responsible for proving all the claims.  Even to the extreme of producing proof of payment if deemed necessary."  Hutchins assumed responsibility for administering Subcontract 11 on or about July 17, 2004, after Matovinovic departed Iraq.

13

41.     On August 4, 2004, Al-Absi presented an amended Delay REA to KBR.  The amended REA stated that "[t]he **actual cost** FKTC [First Kuwaiti Trading Company] experienced per day for each idle truck [and driver] is USD$500.00 . . . .," and that those "**actual costs** . . . are supported by lease invoices including driver costs at USD$500.00 per day . . . " (emphasis added).  Al-Absi also stated that the $500 rate had been "verified" by a "KBR analyst" based upon a "statistically relevant sample of invoices" for the trucks First Kuwaiti had leased "for the Camp Anaconda works."

42.     In fact, First Kuwaiti's actual cost was far less than $500 a day for each idle truck and driver (explained more fully in paragraphs 50 - 54 below), the $500 rate was not supported by lease invoices from First Kuwaiti's truck suppliers to First Kuwaiti, and no KBR analyst had reviewed or verified the $500 rate based on truck lease invoices from the truck suppliers to First Kuwaiti.  Further, First Kuwaiti knew these statements were false.

43.     On August 4, 2004, the same date as First Kuwaiti's amended Delay REA, Hutchins represented that the $500 rate was First Kuwaiti's "actual cost" per day in a memorandum to the Subcontract 11 file that repeated verbatim many of the phrases in the amended Delay REA (repetition indicated in italics):

> The actual cost [First Kuwaiti] experienced per day for each idle truck [and driver] is USD$500.00, which the *KBR analyst verified* by requesting a *statistically relevant sample of invoices* for a total of 30 trucks from the 197 incremental trucks leased by [First Kuwaiti] *for the Camp Anaconda works*.

KBR repeated this statement in a certified claim under the Contract Disputes Act, presented to the Administrative Contracting Officer on November 4, 2010 (see paragraphs 76 - 79 below).

44.     In fact, no KBR analyst had reviewed or verified the $500 rate based on invoices from First Kuwaiti's truck suppliers to First Kuwaiti, as KBR admitted in a June 21, 2005 letter to DCAA:  "KBR did not review [First Kuwaiti's] accounting records."

45.     Although Hutchins "documented" the $500 rate as First Kuwaiti's actual cost in the file, he proceeded to negotiate with First Kuwaiti.  He told First Kuwaiti that the $500 rate was too high to be considered reasonable and said that KBR would pay no more than $300 a day ($200 a day for idle trucks and $100 a day for idle drivers).  Hutchins also reduced the number of delay days from 83,942 to 83,078.  Hutchins reduced the number of delay days to exclude days First Kuwaiti agreed "must be considered for the Subcontractor's account only, per contract terms."  The reduction was not an attempt to assess whether any of the delays were attributable to KBR, First Kuwaiti, or force majeure, rather than to the United States.  As was true in First Kuwaiti's original claim, all alleged delay was attributed to the Government.

46.     When KBR and First Kuwaiti settled the Delay REA, they both knew that not all delay was attributable to the United States.  For example, in a December 31, 2003 internal KBR email, Ray states:

> Remind [First Kuwaiti] that this delay is partially of their making –
> if they had delivered the containers on the schedule that they
> originally gave us we would not have such a big problem now.  Let
> them know that we will be looking for them to pick up a
> percentage of the costs.

Ray addressed this email to Bailey and Matovinovic ("Jake") (although Matovinovic does not appear in the "To" line), with copies to KBR Senior Contracts Manager for LOGCAP III, Mary L. Wade, KBR Procurement Director for the Middle East Tom Quigley, and others.

KBR and First Kuwaiti also knew that First Kuwaiti paid far less than the rates First Kuwaiti had claimed for idle trucks and drivers and knew that First Kuwaiti had assumed the risk of any increased cost due to convoy-related delays under the terms of Subcontract 11.

47.     Nevertheless, KBR and First Kuwaiti agreed to settle the Delay REA for $24,923,400, based on 83,078 delay days at $300 a day ($200 for trucks and $100 for drivers).

48.    On August 12, 2004, KBR executed Change Order 8 to Subcontract 11, reflecting the $24,923,400 increase in the subcontract price for the Delay REA.

49.    In September 2004, KBR billed the Government, and the Government paid, $24,923,400 for KBR's costs attributable to First Kuwaiti's Delay REA, plus related fees and costs.

### 1.    First Kuwaiti and KBR Knew that First Kuwaiti's Truck Costs Were Inflated

50.    First Kuwaiti's actual incurred cost per truck was $47 or $60 a day, not the $200 claimed in its Delay REA, according to letter of credit information contained in certain First Kuwaiti truck leases that KBR produced to the United States in February 2012.  KBR itself received those leases (through Senior Manager for Government Compliance Theodore E. Needham, III) on December 21, 2006, but withheld them from the United States for more than five years despite repeated requests for cost data to support the Delay REA by Government officials.  When First Kuwaiti forwarded the leases to KBR in December 2006, it sought to conceal the actual rates it paid for the trucks by redacting any references to the rates in the documents.  In three instances, however, First Kuwaiti failed to redact information from which the lease rates could be calculated.

51.    Several of the leases required First Kuwaiti to obtain letters of credit guaranteeing payment under the lease.  The amount of the letter of credit was redacted from all but three of the leases.  These leases contained the following letter of credit information:

a.    An October 18, 2003 lease of 50 tractor trailers for 180 days from Bakhashab Transport provided in paragraph 5:

> The Second Party [First Kuwaiti] shall issue a bank letter of credit of USD 420.000.000 (Only Four Hundred and Twenty Thousand American Dollars) effective from the date hereof and shall be valid

> for six months. The said letter of credit shall be divisible and
> irrevocable.

Based on this information, the United States calculates that the actual cost incurred by First

Kuwaiti per truck per day under this lease was approximately $47 ($420,000 ÷ 50 tractor trailers

÷ 180 days = $46.67 a day).

        b.     An October 20, 2003 lease of five truck tractors for 180 days from

Bakhashab Establishment provided in paragraph 5:

> The Second Party [First Kuwaiti] shall issue a bank letter of credit
> of USD $ 42,000.000 (Only Forty Two Thousand American
> Dollars) effective from the date hereof and shall be valid for six
> months. The said letter of credit shall be divisible and irrevocable.

Based on this information, the United States calculates that the actual cost incurred by First

Kuwaiti per truck per day under this lease was approximately $47 ($42,000 ÷ 5 truck trailers ÷

180 days = $46.67 a day).

        c.     An October 20, 2003 lease of 15 flatbed trailers and truck tractors for

180 days from Bakhashab Transport provided in paragraph 5:

> The Second Party [First Kuwaiti] shall issue a bank letter of credit
> of RS 600.000.000 (Only Six Hundred Thousand Saudi Riyals)
> effective from the date hereof and shall be valid for six months.

Based on this information, the United States calculates that the actual cost incurred by First

Kuwaiti per truck per day under this lease was approximately $60 (600,000 Saudi Riyals at the

2003 exchange rate of 1 Saudi Riyal/$0.2666 = $159,960; $159,960 ÷ 15 tractor trailers ÷

180 days = $59.24 a day).

      52.     Thus, KBR was on notice by at least December 21, 2006, that First Kuwaiti was

concealing its actual truck costs. Moreover, by that date, KBR had information revealing that

First Kuwaiti's truck costs were only $47 or $60 a day, rather than the $200 a day First Kuwaiti

claimed in its Delay REA and KBR charged to the Government.

53.     Subcontract 11 gave KBR the right to review First Kuwaiti's unredacted truck leases and the invoices from its truck suppliers.  According to the August 4, 2004 Hutchins memorandum, KBR had reviewed and "verified . . . a statistically relevant sample of invoices for a total of 30 trucks . . . ."  Had KBR availed itself of its right to review the leases and invoices, it would have confirmed that First Kuwaiti had paid only $47 or $60 a day for trucks.

54.     KBR also had information that called into question First Kuwaiti's claimed driver costs.  KBR logistics supervisor Kay Williams had informed Hutchins by August 4, 2004, that "the normal cost of paying a driver's [*sic*] at that time frame was USD$50-100 round trip flat rate."  In its claim, First Kuwaiti assumed a round trip (delivery and return) would require five to seven days.  Therefore, First Kuwaiti's daily rate for drivers would have been $7 to $20 a day, not the $100 rate claimed by KBR and First Kuwaiti.

55.     In addition, KBR had information that called into question the accuracy and truthfulness of the convoy logs that First Kuwaiti provided to KBR to support its delivery of the living trailers into Iraq.  These logs purport to show the drivers and trucks that participated in each convoy, the dates on which those drivers and trucks departed from Kuwait to Iraq, and the dates on which they returned to Kuwait.  In fact, the logs reflect that First Kuwaiti counted a number of its drivers and trucks twice.  For example,

a.      According to the log for Convoy AHFB361HN498 on December 27, 2003, drivers Milanes Guillermo and Delen Eloso Artemio drove truck numbers F-420 and F-482, respectively.  Guillermo returned on December 31, 2003.  Artemio, however, did not return until January 12, 2004.  According to another log document for Trip FK1B9A05, the same two drivers participated in a different convoy on December 27, 2003, returning on January 2, 2004.  Guillermo and Artemio could not have driven in two different convoys on the same day.

Moreover, according to the log for Convoy AHFB361HN498,  Artemio had not even returned from the first convoy until January 12, 2004.

   b.  According to the log for Convoy AHGA323HN440, drivers Younous Mahamat Issa and Oumar Nigare Khalifa, driving truck numbers S-575 and S-594, respectively, left Kuwait November 19, 2003 and returned November 27, 2003.  Yet, according to the log for Convoy AHGA324HN463, Issa and Khalifa left on another convoy, driving the same trucks, on November 20, 2003.  Issa and Khalifa could not have driven on two convoys at the same time.

   **2**. **KBR and First Kuwaiti Knew Even Before the Award of Subcontract 11 that Red Sea Could Not Manufacture the Living Trailers Fast Enough to Meet the Deadlines Required by the Subcontract**

   56. First Kuwaiti's ability to meet the subcontract deadline for delivery and installation of the living trailers depended on having 57 living trailers loaded on trucks and ready to depart the Kuwait-Iraq border each day from October 24, 2003 to the December 15, 2003 completion date.  First Kuwaiti and KBR knew, however, that Red Sea could not manufacture enough living trailers in sufficient time for First Kuwaiti to deliver 57 trailers a day to the Kuwait-Iraq border to meet this schedule.  (In fact, to meet the deadline to deliver **and install** the living trailers at Camp Anaconda in Iraq, First Kuwaiti would have to have had the final living trailers delivered to the border sometime before the December 15, 2003 deadline.)

   57. First Kuwaiti entered into an exclusive agreement with Red Sea to manufacture the trailers that First Kuwaiti intended to use to fulfill the requirements of Subcontract 11 at Camp Anaconda.

   58. On September 28, 2003, KBR (Matovinovic) asked First Kuwaiti for its delivery schedule for the trailers.  KBR needed the information for its "planning process."

59.     On September 29, 2003, Red Sea sent a letter to First Kuwaiti (Al-Absi) advising

First Kuwaiti of Red Sea's production capacity.  This capacity fell far short of the December 15,

2003 deadline and clearly anticipated continuing production past the deadline into January 2004:

> This is to confirm our agreement with First Kuwaiti Trading &
> Contracting Co., (FKTC) to produce exclusively living modules
> containers, Sitemaster III Series for Log gap III [*sic*] project in
> Iraq, as per the following schedule:
>
> 1.  15th October 2003 to 31st October 2003    -   15 units per day
> 2.  1st November 2003 to 30th November 2003 - 22-25 units per day
> 3.  1st December 2003 to 31st December 2003 -  40 units per day
> 4.  1st January 2004 to 31st January [2004] -       45 units per day
>
> After 31st January 2004, we are able to continue producing 45 units
> per day provided that we have an order on or prior to 10th October
> 2003.
>
> Materials will be produced in Saudi Arabia and Jabal Ali - Dubai.
>
> FKTC will be in-charge [*sic*] of transportation and installation in
> location.

60.     On September 29, 2003, Al-Absi sent an email forwarding Red Sea's production

schedule to Matovinovic at KBR:

> Please find enclosed confirmation from Red Sea on the schedule
> we sent you with improvement on December and January, 04.

Under this production schedule, Red Sea would have been able to ship only 1,645 trailer units to

First Kuwaiti by December 15, 2003 – far short of the 2,252 units LOGCAP III required to be

delivered **and installed** at Camp Anaconda by that date.

61.     Consequently, KBR and First Kuwaiti knew that First Kuwaiti had incurred delay

because First Kuwaiti could not get enough living trailers to the border to meet the December 15,

2003 deadline to complete the subcontract.  Nevertheless, neither First Kuwaiti nor KBR made

any attempt to exclude the days attributable to these delays from First Kuwaiti's Delay REA.

62. KBR and First Kuwaiti also knew the number of delay days was false because many of the delays were caused by weather, force majeure, and other non-compensable causes, not by the United States.

## IV. KBR and First Kuwaiti's False Claims

### A. False Claim No. 1

63. On August 31 2004, KBR billed the Government $48,754,547.25 for its costs attributable to First Kuwaiti's Double Handling and Delay REAs, plus related fees and costs, which the Government paid in September 2004. KBR billed the Government for First Kuwaiti's REAs knowing that the costs for cranes and other items were inflated. Further, KBR billed the Government knowing that First Kuwaiti had a history of inflating costs and without verifying First Kuwaiti's actual cost, despite its right to do so under Subcontract 11. Furthermore, KBR and First Kuwaiti both knew that much of the delay was due to causes other than the Government and that First Kuwaiti had assumed the risk of increased cost due to convoy-related delays under Subcontract 11. Therefore, First Kuwaiti and KBR knowingly presented, or caused to be presented, a false claim to the United States.

### B. False Claim No. 2

64. On June 30, 2005, DCAA issued Form 1 No. 96, "Notice of Contract Costs Suspended And/Or Disapproved," suspending as unsupported and, therefore, unreasonable $50,176,686 – the total burdened costs KBR billed to the Government for First Kuwaiti's Double Handling and Delay REAs.

65. On March 17, 2006, DCAA issued Form 1 No. 100, which resolved the suspended amount and disapproved $51,273,482. The difference in the amounts was due to an adjustment of the indirect rate applied to the costs.

66.     On December 29, 2006, the Defense Contract Management Agency (DCMA) Administrative Contracting Officer (ACO) issued an Interim Determination that provisionally allowed $25,564,516 of the costs disapproved by DCAA in Form 1 No. 100.  The ACO accepted on an interim basis that some of the delays claimed by First Kuwaiti were caused by the Government and, therefore, allowed half of the 83,078 days claimed, or 41,539 days.  The ACO also accepted KBR's representation that $200 a day was a "reasonable" rate for First Kuwaiti's leased trucks based on a comparison KBR provided with lease prices KBR allegedly paid for trucks to other subcontractors in unrelated transactions.  The ACO also allowed some costs under the Double Handling REA.

67.     KBR knew that the $200 rate was not reasonable, or at a minimum recklessly disregarded or deliberately ignored whether that rate was reasonable, because (a) by the time KBR represented to the ACO that the $200 rate was reasonable KBR had already received the truck leases from First Kuwaiti, including the leases that contained the unredacted letter of credit information indicating that First Kuwaiti had paid only $47 or $60 a day for trucks; (b) First Kuwaiti was required under Subcontract 11 to support its actual costs; (c) KBR had the right under Subcontract 11 to verify those costs and the obligation under LOGCAP III to do so; and (d) First Kuwaiti had a history of inflating its costs.

68.     KBR concealed First Kuwaiti's December 30, 2003 proposal, the truck and crane leases, and the information contained in the leases from the ACO.  This information was material to the ACO's Interim Determination.

69.     On January 31, 2007, DCAA issued Form 1 No. 126 revising the disapproved costs to $25,708,966 (the remaining balance of claimed costs after deducting the costs the ACO had provisionally allowed).  On February 7, 2007, DCAA approved payment of the provisionally allowed amount to KBR, which the Government subsequently paid.

C.     **False Claim No. 3 (Reverse False Claim)**

70.     On May 19, 2008, another ACO notified Kellogg Brown & Root Services, Inc.

(KBRSI) that he was reversing the Interim Determination, having concluded that the supporting

information provided by Al-Absi and First Kuwaiti was not credible based on kickbacks Al-Absi

had paid to KBR Subcontract Administrator Anthony J. Martin for other truck and trailer

subcontracts KBR awarded to First Kuwaiti.  Martin had pleaded guilty to entering a kickback

scheme with Al-Absi in which he received $10,000 and was promised an additional $190,000 to

award First Kuwaiti subcontracts for trucks and trailers under LOGCAP III, Task Order 43 (the

Transportation Mission).  *United States v. Martin*, Criminal Case No. 07-40042 (C.D. Ill.) (July

13, 2007).

71.     On June 20, 2008, the ACO issued KBRSI a letter formally reversing his Interim

Determination.

72.     On July 18, 2008, KBRSI wrote to the ACO asserting its entitlement to the money

and again representing that First Kuwaiti's costs were reasonable:

> [T]here is ample evidence of the reasonableness of the two REA
> settlements provided to date by KBR which came from
> independent sources. . . . KBR has challenged, probed, adjusted,
> and negotiated the amounts claimed by [First Kuwaiti].  KBR . . .
> [has] independently verified facts relating to the issues involved
> and the damages incurred.

Specifically with respect to First Kuwaiti's truck rate, KBRSI stated, "Adequate price analysis

was provided to determine the fair [*sic*] and reasonableness of delay costs per day."

73.     KBRSI made this representation to conceal, avoid, or decrease an obligation to

pay the United States the monies the ACO had determined KBR owed in his May 19, 2008 and

June 20, 2008 letters.  KBRSI knew that this representation was false, or at a minimum

recklessly disregarded or deliberately ignored whether it was false, because (a) KBR had in its

possession First Kuwaiti's December 30, 2003 proposal that included First Kuwaiti's prices for cranes and other items; (b) KBR had already received crane leases from First Kuwaiti showing that First Kuwaiti had paid only $8,250 a month for each crane, rather than the $23,000 a month First Kuwaiti claimed; (c) KBR had already received the truck leases from First Kuwaiti, including the leases that contained the unredacted letter of credit information indicating that First Kuwaiti had paid only $47 or $60 a day for trucks; (d) First Kuwaiti was required under Subcontract 11 to support its actual costs; (e) KBRSI had the right under Subcontract 11 to verify those costs and the obligation under LOGCAP III to do so; and (f) First Kuwaiti had a history of inflating its costs.

74.     On September 10, 2008, First Kuwaiti, through its legal counsel in the United States, sent a letter to the ACO urging him to reverse his decision demanding KBRSI to repay the Government.  First Kuwaiti stated that KBRSI had provided sufficient information to support the ACO's Interim Determination that First Kuwaiti's delay costs were reasonable.

75.     First Kuwaiti made this statement in collusion with KBR to conceal, avoid, or decrease KBR's obligation to pay the Government monies the ACO had determined KBRSI owed in his May 19, 2008 and June 20, 2008 letters.   First Kuwaiti knew this statement was false because (a) First Kuwaiti knew that it had paid only $8,250 a month for each crane, rather than the $23,000 a month claimed; and (b)  First Kuwaiti knew that it had paid only $47 or $60 a day for each truck, and not the $200 a day claimed.

        **D.**        **False Claim No. 4 (KBRSI's Certified Claim)**

76.     On November 4, 2010, KBRSI submitted a certified claim to the ACO pursuant to the Contract Disputes Act, 41 U.S.C. § 605 (now codified at 41 U.S.C. § 7103), for the costs of the Double Handling and Delay REAs.  KBRSI Senior Manager for Government Compliance

Theodore E. Needham, III certified that the claim was made in good faith, was accurate and complete, and that it accurately reflected the amount KBRSI believed it was owed:

> I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable . . . .

77.    In fact, KBRSI knew that this certification was neither complete nor accurate because (a) KBR had in its possession, yet failed to disclose, First Kuwaiti's December 30, 2003 proposal that included First Kuwaiti's prices for cranes and other items; (b) KBR had already received, yet failed to disclose, crane leases from First Kuwaiti showing that First Kuwaiti had paid only $8,250 a month for each crane, rather than the $23,000 a month First Kuwaiti claimed; and (c) KBR had already received, yet failed to disclose, truck leases from First Kuwaiti, including the leases that contained the unredacted letter of credit information indicating that First Kuwaiti had paid only $47 or $60 a day for trucks.  Indeed, the December 21, 2006 email from First Kuwaiti to KBR attaching the crane and truck leases had been sent to the same KBRSI official who certified the claim – Theodore E. Needham, III.  KBRSI's submission of its false certified claim constituted an act in furtherance of the conspiracy between KBR and First Kuwaiti to get false or fraudulent claims allowed or paid, and to commit a violation of 31 U.S.C. 3729(a)(1)(A) or (G).

78.    Besides the certification, KBRSI's claim contained numerous statements KBR knew were false, including repeating the assertion that First Kuwaiti's actual cost for trucks and drivers was $500 and that a KBR analyst had verified those costs:

> The actual cost [First Kuwaiti] experienced per day for each idle truck is USD$500.00, which the KBR analyst verified by requesting a statistically relevant sample of invoices for a total of 30 trucks from the 197 incremental trucks leased by [First Kuwaiti] for the Camp Anaconda works.

25

KBRSI's submission of these false statements constituted acts in furtherance of the conspiracy between KBR and First Kuwaiti to get false or fraudulent claims allowed or paid, and to commit a violation of 31 U.S.C. 3729(a)(1)(A) or (G).

79.     On July 29, 2011, the ACO made a final decision that KBRSI was entitled to $3,783,005 on First Kuwaiti's Double Handling REA and nothing on the Delay REA. Consequently, KBRSI was allowed to retain the $3,783,005, and directed to refund to the Government the remaining $21,781,512.

**V.     Additional Evidence that KBR and First Kuwaiti Knew that First Kuwaiti Was Not Entitled to Its Double Handling and Delay REAs**

80.     Under the False Claims Act, a person "knows" that a claim is false if that person has actual knowledge that the information is false, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).  The following paragraphs provide additional evidence that KBR and First Kuwaiti knew that their claims were false.

**A.     KBR Knew First Kuwaiti Could Not Be Trusted**

81.     Two months before KBR awarded Subcontract 11 to First Kuwaiti, KBR quality assurance personnel recommended  permanently disqualifying the company from receiving any contracts for living containers and related structures:

> First Kuwaiti has a proven track record of substandard overall prefab structures quality on LOGCAP III Kuwait sites. Recommend **permanent disqualification** of this company by KBR re prefabricated structures (containers, warehouses, etc.) and related services of any type.

KBR Quality Surveillance/Inspection Report, Container Master Plan Agreement Technical Proposals (August 9, 2003) (emphasis added).  Consequently, when First Kuwaiti submitted its Double Handling REA, KBR had reason to suspect that its repair costs were necessary to fix

"substandard" structures rather than double handling resulting from alleged Government-caused delay.

82. In July 2004, contemporaneously with KBR's consideration of First Kuwaiti's REAs, a KBR representative characterized Al-Absi's claims to KBR under several other subcontracts between KBR and First Kuwaiti as "absolute highway robbery." He wrote further, "I am tired of [First Kuwaiti] trying to milk KBR of extra money and false claims."

83. First Kuwaiti's refusal to provide truck leases with unredacted rates also put KBR on notice that those rates did not support First Kuwaiti's Delay REA.

84. KBR also knew by the time it submitted False Claim Nos. 3 and 4 that Al-Absi had paid Martin kickbacks for the award of other truck and trailer subcontracts to First Kuwaiti.

85. Thus, under the circumstances, KBR acted with actual knowledge that its claims were false or, at a minimum, with reckless disregard for or deliberate ignorance of the truth, when it submitted claims without first verifying First Kuwaiti's actual cost. Moreover, First Kuwaiti had a duty to support its costs under Subcontract 11, and KBR had the right and obligation to demand those records under the subcontract, but inexplicably failed to do so.

**B.     Subcontract 11 Required First Kuwaiti to Support Its REA Claims Based on Actual Cost and KBR the Right and Obligation to Inspect First Kuwaiti's Records to Verify that Cost**

86. Subcontract 11 required First Kuwaiti to maintain cost records and gave KBR the right to inspect those records:

> Subcontractor shall maintain books and records reflecting performance of the [work] and shall preserve such books and records for a period of three years after completion and acceptance of the Project as a whole. [KBR] shall have the right to inspect and audit such part of the records as relate to cost reimbursement . . . .

Subcontract 11, General Conditions, ¶ 9.4 (Records and Accounts; Audit).

87.    Subcontract 11 further required to First Kuwaiti to submit "proper evidence" of

payment of all bills:

> With each request for progress payments, Subcontractor shall
> submit proper evidence including affidavits and certificates
> showing:  (a) the portion of the Sublet Work completed;
> (b) compliance with all requirements of this Subcontract;
> (c) payment of all bills; and (d) that no liens exist or could be
> claimed arising from the Sublet Work.

Subcontract 11, General Conditions, ¶ 3.1.1 (Payment).

> SUBCONTRACTOR'S invoice in triplicate with all requested
> documentation and proof of Payment [*sic*] of bills shall be
> submitted for approval by CONTRACTOR.

Subcontract 11, Subcontract Terms, ¶ 5.1 (Payment).

88.    In addition, Subcontract 11 incorporated Defense Federal Acquisition Regulation

Supplement (DFARS) 252.243-7001, which in turn rendered the cost principles and procedures

in FAR Part 31 applicable to any price adjustment under the subcontract:

> When costs are a factor in any price adjustment under this contract,
> the contract cost principles and procedures in FAR Part 31 and
> DFARS Part 231, in effect on the date of this contract, apply.

89.    One of the incorporated FAR Part 31 provisions, FAR 31.201-2 (Determining

Allowability), establishes that an incurred cost is allowable only if it is reasonable, allocable,

consistent with generally accepted accounting principles, the terms of the contract in question,

and any other limitations in FAR Part 31.2.  Most importantly, FAR 31.201-2 requires as a

condition to claiming and recovering costs from the United States, that the contractor be able to

prove through its accounting records that the cost was actually incurred:

> A contractor is responsible for accounting for costs appropriately
> and **for maintaining records, including supporting
> documentation, adequate to demonstrate that costs claimed
> have been incurred**, are allocable to the contract, and comply
> with applicable cost principles in this subpart and agency

supplements.  **The contracting officer may disallow all or part of a claimed cost that is inadequately supported.**

FAR 31.201-2(d) (emphasis added).

90.    KBR's failure to exercise its right to inspect First Kuwaiti's cost records and failure to enforce Subcontract 11's terms requiring First Kuwaiti to support all claims for payment and placing the risk of delay on First Kuwaiti demonstrate at the very least KBR's reckless disregard for or deliberate ignorance of the truth of its claims.

## VI.    Statute of Limitations

91.    The first claim giving rise to this action was presented to the United States in September 2004.  The statute of limitations on this action has not expired because the material facts were not known to the United States (a) until February 4, 2012, with respect to the claims for the Delay REA costs, when KBR produced English-language translations of First Kuwaiti's redacted leases with information indicating that First Kuwaiti's actual cost for trucks and drivers was far below the $300 a day rate claimed; (b) until May 11, 2012, with respect to the Double Handling REA costs, when KBR produced English-language translations of First Kuwaiti's crane leases indicating that First Kuwaiti's actual cost for cranes was far below the $23,000 a month rate claimed; and (c) until October 18, 2012, with respect to the information in First Kuwaiti's December 31, 2003 proposal.  Until these dates, KBR had concealed those facts from the United States.  Moreover, the statute of limitations has been suspended by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, until five years after the termination of hostilities in Iraq and Afghanistan as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

## FIRST CLAIM

### False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2) (2000)
### Against KBR and First Kuwaiti

92.     The United States realleges paragraphs 1 through 91.

93.     KBR and First Kuwaiti knowingly presented, or caused to be presented, to an officer or employee of the United States or a member of the Armed Forces, a false or fraudulent claim for payment or approval, in violation of 31 U.S.C. § 3729(a)(1), or knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2), i.e., KBR's August 2004 claim to the United States for reimbursement of First Kuwaiti's Double Handling and Delay REAs.

94.     As a result of this claim, the United States paid KBR and suffered damages to be determined at trial.

## SECOND CLAIM

### False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2) (2000)
### Against KBR and First Kuwaiti

95.     The United States realleges paragraphs 1 through 91.

96.     KBR and First Kuwaiti knowingly presented, or caused to be presented, to an officer or employee of the United States or a member of the Armed Forces, a false or fraudulent claim for payment or approval, in violation of 31 U.S.C. § 3729(a)(1), or knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2), i.e., KBR's 2007 claim to the United States for reimbursement of First Kuwaiti's Double Handling and Delay REAs following the ACO's December 29, 2006 Interim Determination.

97.     As a result of this claim, the United States paid KBR and suffered damages to be determined at trial.

## THIRD CLAIM

**False Claims Act, 31 U.S.C. §§ 3729(a)(7) (2000)
Against KBR and First Kuwaiti**

98.     The United States realleges paragraphs 1 through 91.

99.     KBR and First Kuwaiti knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(7) (2000).

100.    By reason of their acts and omissions to avoid KBR's obligation to repay the amount provisionally paid to KBR in 2007, KBR and First Kuwaiti caused the United States to sustain damages in an amount to be determined at trial.

## FOURTH CLAIM

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2006 & Supp. III 2009)
Against KBR and First Kuwaiti**

101.    The United States realleges paragraphs 1 through 91.

102.    KBR and First Kuwaiti knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A), i.e., KBRSI's November 4, 2010 certified claim.

## FIFTH CLAIM

**False Claims Act,  31 U.S.C. §§ 3729(a)(3) (2000) and
3729(a)(1)(C) (2006 & Supp. III 2009)
Against KBR and First Kuwaiti**

103.    The United States realleges paragraphs 1 through 91.

104.    KBR, its various corporate entities, and First Kuwaiti conspired to defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C.

§ 3729(a)(3) (2000), or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (G)
(2006 & Supp. III 2009), in violation of 31 U.S.C. § 3729(a)(1)(C) (2006 & Supp. III 2009).

105.    By reason of their acts and omissions, KBR and First Kuwaiti caused the United
States to sustain damages in an amount to be determined at trial.

### SIXTH CLAIM

**Contract Disputes Act, 41 U.S.C. § 7103(c)(2) (2006 & Supp. IV 2010)**
**Against KBRSI**

106.    The United States realleges paragraphs 1 through 91.

107.    On November 4, 2010, KBRSI submitted a certified claim to the ACO that was
false and unsupported due to a misrepresentation of fact or fraud, in violation of 41 U.S.C.
§ 7103(c)(2).

### SEVENTH CLAIM

**Breach of Contract**
**Against KBRSI**

108.    The United States realleges paragraphs 1 through 91.

109.    LOGCAP III permitted KBRSI to bill the Government only for its allowable costs
under the contract.  To be allowable, costs must be incurred, reasonable in amount, allocable to
the contract, and not otherwise unallowable under applicable statutes and regulations.  *See*
FAR 52.216-7(a) ("The contractor may submit to an authorized representative of the Contracting
Officer, in such form and reasonable detail as the representative may require, an invoice or
voucher supported by a statement of the claimed allowable cost for performing this contract.")

110.    KBRSI claimed costs under LOGCAP III attributable to First Kuwaiti's Double
Handling and Delay REAs, including costs that were not incurred, reasonable, allocable, or
allowable under the contract.  On July 29, 2011, the ACO ordered KBRSI to repay $21,781,512

in such costs. KBRSI's claims and refusal to repay such unallowable costs constitutes a breach of LOGCAP III.

111.    By reason of KBRSI's breach, the United States suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff United States prays for judgment against KBR and First Kuwaiti as follows:

a.    Under the United States' First, Second, Third, Fourth, and Fifth Claims against KBR and First Kuwaiti, jointly and severally, three times the amount of damages sustained because of the acts of the defendants, plus civil penalties as allowed by law;

b.    Under the United States' Sixth Claim against KBR, the part of KBRSI's certified claim that is false and unsupported due to a misrepresentation of fact or fraud, plus the Government's costs of review;

c.    Under the United States' Seventh Claim against KBRSI, damages in the amount of KBRSI's claims for unallowable costs under LOGCAP III paid by the Government and retained by KBRSI; and

d.    Such other relief as the Court may deem just and proper, together with interest, costs, and the disbursements of this action.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JAMES A. LEWIS
United States Attorney
Central District of Illinois

*Russell B. Kinner*

_____

MICHAEL D. GRANSTON
JUDITH RABINOWITZ
JOHN A. KOLAR
RUSSELL B. KINNER
Attorneys, Civil Division
U.S. Department of Justice
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone: 202.307.1089
Facsimile: 202.514.7361

Attorneys for the United States of America

Dated: December 21, 2012