UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-cv-4110-SLD-JAG |
| | ) | |
| KELLOGG BROWN & ROOT SERVICES, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | | |

## ORDER

Plaintiff United States of America claims that contractor Kellogg Brown & Root Services, Inc. ("KBR")[1] and its subcontractor, First Kuwaiti Trading Company (in its various incarnations, collectively "First Kuwaiti"), inflated the costs of providing living quarters for American troops in Iraq. KBR has moved to dismiss the Government's seven causes of action under Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). Because the pleadings exhaustively present the issues under consideration at this procedural stage, KBR's Renewed Request for Hearing on Defendants' Motion to Dismiss, ECF No. 48, is DENIED. KBR's Motion for Leave to Reply to the Government's Response, ECF No. 30, is GRANTED. For the following reasons, KBR's Motion to Dismiss Complaint, ECF No. 24, is DENIED.

## BACKGROUND

On December 14, 2001, the U.S. Army awarded the Logistics Civil Augmentation Program III ("LOGCAP III") contract to KBR for the provision of support services in the Iraqi

---

[1] Specifically, the Government has named as defendants Kellogg Brown & Root Services, Inc., and its successor Kellogg Brown & Root LLC, who will be collectively referred to as "KBR."

military theater.[2]  LOGCAP III is an umbrella contract for indefinite delivery of an indefinite number of services.  The contract is performed through task orders which prescribe a specific scope of work.  Much of KBR's work under LOGCAP III has been performed through subcontractors; KBR pays them for the actual cost of their services and seeks reimbursement from the Government for this amount, plus a 1% base fee and a discretionary award of up to 2%.

On August 27, 2003, the Army included support for Operation Bed Down[3] within KBR's LOGCAP III portfolio.  KBR was to "provide, setup, operate and maintain" 2,252 living trailers at Camp Anaconda in Iraq no later than December 15, 2003.  On October 16, 2003, KBR awarded Subcontract 11 to First Kuwaiti to provide, deliver, and install 2,252 living trailers at Camp Anaconda by December 15, 2003.  Subcontract 11 provided that First Kuwaiti would not receive additional pay for expenses incurred as a result of delays caused by force majeure, but could receive allowances for "delays in convoy coordination and support." According to KBR Claims Group counsel David Brenner, "allowances" meant additional time, but not financial compensation.  Before Subcontract 11 was awarded, First Kuwaiti and KBR both received the production schedule from First Kuwaiti's subcontractor, the manufacturer Red Sea Housing Services Co., Ltd.  According to that schedule, Red Sea could only make and deliver 1,645 living trailers to the Iraq border by December 15, 2003.  Despite the terms of Subcontract 11, First Kuwaiti later presented several requests to KBR for equitable adjustment ("REA") of the subcontract price for delays that occurred.

---

[2] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff.  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted).  Accordingly, unless otherwise noted, the statement of facts in this section is based solely on allegations in the Government's First Amended Complaint, ¶¶ 7–90, ECF No. 3.

[3] Operation Bed Down was an initiative to replace the tents used to house troops in the early days of the Iraq war with living trailers and containers.

## I.    Double Handling REA

In May and June 2004, First Kuwaiti submitted four REAs for "repair costs and double-handling" due to alleged Government-caused delays; these four REAs were later consolidated into a single REA totaling $30,638,102.  First Kuwaiti claimed that it had to hold the trailers at temporary storage locations due to convoy and site-preparation delays.  To accomplish this, First Kuwaiti leased land, cranes, and other equipment and hired personnel it otherwise would not have needed; the increased handling also resulted in damage to the trailers, which First Kuwaiti had to repair.

On December 30, 2003, First Kuwaiti gave KBR a price proposal of $647,500 per month for leasing land and conducting operations at a temporary storage yard.  Although KBR considered incorporating that rate into the claim it would later present to the Government for payment, internal emails reveal that KBR employees believed First Kuwaiti's price proposal was "exorbitant" and "unreasonable."  In a July 3, 2004 email, KBR Government Operations Administrator Jay Patterson wrote that First Kuwaiti had been told "the price is too high" and that KBR was waiting for a "reasonable price."  Later that day, KBR Property Manager for Iraq Donald Bailey replied that the price was "unreasonable" and stated that the price quoted by KBR in its Material Requisition should be based on a "fair price," not necessarily the subcontractor's price.  The Material Requisition KBR ultimately submitted was $115,000 per month.

The Government also points to First Kuwaiti's claimed crane lease prices to further illustrate the unreliability of its alleged costs.  In its double handling REAs, submitted to KBR in May and June 2004, First Kuwaiti originally claimed a cost of $20,000 per month per crane to lease 14 extra cranes for a period of six to eight months.  When KBR requested a more detailed cost breakdown, First Kuwaiti submitted a $23,000 per month crane price.  However, on June 10,

2004, KBR Material Control Supervisor Bret James emailed KBR Subcontract Administrator Jakob Matovinovic information to use as a "barometer" to measure the double handling REA—namely, First Kuwaiti's December 30, 2003 proposal, which indicated a crane price of $12,000 per month.[4] On December 21, 2006, First Kuwaiti provided lease agreements for 11 of the 14 cranes to KBR Senior Manager for Government Compliance Theodore Needham III. Most of these leases indicated a price of $8,250 per month. Despite repeated requests by Government officials for First Kuwaiti's actual costs, KBR did not submit the crane leases until May 11, 2012; KBR submitted First Kuwaiti's December 30, 2003 proposal and related emails on October 18, 2012.

KBR concluded that one-third to one-half of the repair costs in the double handling REA were unjustified because they represented double charging, were due to manufacturing defects, or overstated both the number and costs of repairs needed. On July 14, 2004, however, KBR offered to "settle" the repair costs for 25% less than First Kuwaiti initially claimed if First Kuwaiti agreed "ASAP." If not, First Kuwaiti effectively would be required to support its claim and any price adjustment would be limited to its actual costs. Soon after, KBR and First Kuwaiti settled the double handling REA for $23,831,147.25, which the Government claims included "millions of dollars more," for cranes and repairs than was supported by First Kuwaiti's actual crane costs and KBR's independent evaluation, respectively. KBR billed and was reimbursed by the Government for this REA.

## II.     Delay REA

On July 15, 2004, First Kuwaiti submitted an REA for the costs of 83,942 days of idle truck and driver time due to the delay, all of which it attributed to the Government. On August

---

[4] Other costs outlined in First Kuwaiti's double handling REA also exceeded the costs it originally outlined in its December 30, 2003 proposal. These costs included expenditures for: land rental, flatbeds, loaders, forklifts, and personnel.

4

4, 2004, First Kuwaiti submitted a revised REA and claimed its "actual costs" for the idle trucks and drivers, as supported by lease invoices and verified by KBR, was $500 per day. That same day, KBR Senior Subcontract Administrator Charles Hutchins issued a memorandum indicating that the $500 rate was First Kuwaiti's "actual cost" per day and that a KBR analyst had verified this rate.

In fact, the Government points to a June 21, 2005 letter from KBR to the Defense Contract Audit Agency ("DCAA"), in which KBR states that it "did not review [First Kuwaiti's] accounting records." The Government construes this as an acknowledgment that no KBR analyst had reviewed or verified the $500 rate based on invoices from First Kuwaiti's truck suppliers. Further, although Hutchins documented the $500 rate as First Kuwaiti's actual cost, he told First Kuwaiti that the rate was too high to be reasonable and KBR would only pay $300 per day—$200 per truck and $100 per driver. Further, as indicated by an internal December 31, 2003 email from KBR Regional Lead Contract Administrator James Ray, KBR knew that it was billing for costs of delay not attributable to the Government. At least some of the delay was attributable to First Kuwaiti because it contracted with Red Sea to provide 2,252 living trailers at Camp Anaconda despite knowing Red Sea could only ship 1,645 trailer units by the target date of December 15, 2003. Neither First Kuwaiti nor KBR excluded days attributable to this self-imposed delay from the REA—as well as delay days attributable to weather, force majeure, and other causes not compensable under the contract.

On December 21, 2006, First Kuwaiti gave its truck leases, with the rates redacted, to KBR. KBR did not seek unredacted leases, as it had the right to do under Subcontract 11. In February 2012, after repeated requests for REA-supporting data, KBR provided the redacted truck leases to the Government. Based on unredacted letter of credit information accompanying

the leases, the Government claims it was able to calculate that First Kuwaiti's actual cost per truck was $47 or $60 per day. The Government maintains that, had KBR exercised its Subcontract 11 right to review unredacted leases and invoices, it too could have easily confirmed that First Kuwaiti paid only $47 or $60 a day for trucks.

Regarding the REA's claimed driver costs, KBR logistics supervisor Kay Williams informed Hutchins by August 4, 2004, that "the normal cost" of paying for a driver in that time frame was $50 to $100 round trip. The REA assumed a round trip would require five to seven days, making First Kuwaiti's daily rate for drivers $7 to $20, not $100 as claimed. Further discrediting First Kuwaiti's claim, convoy logs record at least two sets of drivers as participating in two different multi-day convoys simultaneously. Despite these cost and factual discrepancies, KBR and First Kuwaiti agreed to settle the delay REA for $24,923,400 based on 83,078 delay days at $200 a day for trucks and $100 a day for drivers. KBR sought and received reimbursement from the Government based on this amount.

On August 31, 2004, KBR billed the Government $48,754,547.25 for its costs attributable to the double-handling and delay REAs, plus related fees and costs, which the Government paid in September 2004. By March 17, 2006, the DCAA had suspended and disapproved this payment as unsupported. However, an Administrative Contracting Officer ("ACO") at the Defense Contract Management Agency issued an Interim Determination provisionally reinstating $25,564,516 of the payment on December 29, 2006. On June 20, 2008, another ACO reversed the Interim Determination after concluding that the supporting information provided by First Kuwaiti lacked credibility because a kickback scheme between KBR and First Kuwaiti employees had come to light.[5] The final ACO decision on July 29, 2011,

---

[5] In July 2007, KBR Subcontract Administrator Anthony Martin pleaded guilty to agreeing to receive kickbacks from First Kuwaiti General Manager Wadhi Al-Absi in return for awarding First Kuwaiti other subcontracts for

ordered KBR to refund the Government $21,781,512, thereby providing KBR only $3,783,005 in total reimbursement on the REAs. KBR appealed the final ACO decision to the Army Services Board of Contract Appeals ("ASBCA") in August 2011, but that action was dismissed without prejudice when the Government filed the instant fraud-based suit on November 20, 2012. Def.'s Mem. in Supp. Mot. Dismiss 6, ECF No. 25.

### III.    Summary

In total, the Government alleges that KBR made four false claims:

First, on August 31, 2004, KBR billed the Government $48,754,457.25 for the double handling and delay REAs combined, plus contractual fees, based on unverified information.

Second, KBR represented that First Kuwaiti's truck costs were "reasonable," while failing to disclose the actual leases, leading to the ACO's December 29, 2006 Interim Determination provisionally reinstating $25,564,516 in payment to KBR.

Third, following the June 30, 2008 reversal of the Interim Determination, on July 18, 2008, KBR sent a letter to the ACO arguing it was entitled to keep the money. In the letter, KBR claimed it "independently verified" the claims and "adequate price analysis was provided" to determine the reasonableness of the delay costs.

Fourth, on November 4, 2010, KBR submitted a certified claim to an ACO pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–09, for the costs of the double handling and delay REAs, attesting that the claim was "made in good faith," the "supporting data were accurate and complete to the best of [his] knowledge and belief," and the "amount requested accurately reflect[ed] the contract adjustment for which [KBR] believe[d] the Government is liable . . . ."

---

trucks and trailers under LOGCAP III, a revelation that allegedly tarnished First Kuwaiti's credibility. *See United States v. Martin*, No. 07-cr-40042 (C.D. Ill. July 13, 2007).

## DISCUSSION

### I.     Claims at Issue

KBR has moved to dismiss all seven counts brought by the Government. The Government's first two counts claim KBR's 2004 and 2007 claims for reimbursement each gave rise to causes of action under 31 U.S.C. § 3729(a)(1)–(2) (2000).[6] Section 3729(a)(1) (2000) subjected any person to civil liability who "knowingly presents . . . a false or fraudulent claim for payment or approval" by the Government. Section 3729(a)(2) (2000) prohibited knowingly making or using "a false record or statement material to a false or fraudulent claim."

Count III alleges that KBR breached the so-called "reverse false claim" provision of pre-revision § 3729, which conferred liability for knowingly using a false record or statement "to conceal, avoid, or decrease an obligation to pay" the Government. 31 U.S.C. § 3729(a)(7) (2006). Count IV alleges that KBR's November 4, 2010 certified claim violated current § 3729 by "knowingly present[ing] … a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (2009). Count V claims that KBR violated either pre- or post-revision § 3279 by conspiring with its corporate subsidiaries and First Kuwaiti to present false claims to the Government for payment. *See* 31 U.S.C. § 3729(a)(3) (2000); 31 U.S.C. § 3729(a)(1)(A), (G) (2009).

Count VI alleges that KBR breached the antifraud provision of the CDA. Under the CDA, a contractor is liable when its failure to support any part of its claim "is attributable to a misrepresentation of fact or fraud by the contractor." 41 U.S.C. § 7103(c)(2). Count VII claims KBR committed common law breach of contract by billing the Government for non-allowable costs under the LOGCAP III contract.

---

[6] Section 3729(a) was amended in 2009. *See* Pub L. 111-21, § 4(a)(1). The revised version applies only to conduct occurring on or after May 20, 2009. *See id.* § 4(f).

## II.    Rule 12(b)(6) Motion to Dismiss

KBR argues for dismissal of the five FCA counts on the grounds that the Government has not sufficiently pleaded the common element underlying each FCA claim—that KBR knowingly made a false or fraudulent claim or statement.  *See* 31 U.S.C. § 3729(a).  KBR argues that (1) KBR was not required to bill the Government based on First Kuwaiti's actual costs, Def.'s Mem. in Supp. Mot. Dismiss 8–14, ECF No. 25; and (2) KBR acted on a reasonable interpretation of the manner of cost verification required under LOGCAP III and the Federal Acquisition Regulations ("FAR"), *id.* 14–17.  For both reasons, KBR maintains, its claims for reimbursement cannot constitute FCA false claims.

### A.  Legal Standard

The Federal Rules of Civil Procedure require a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim to relief that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Seventh Circuit has identified the practical requirements of *Twombly* and *Iqbal* for federal pleading:

> First, a plaintiff must provide notice to defendants of her claims.  Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim.  Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## B.  Analysis

The FCA requires both that a claim be false and that the defendant knew of its falsity. *See United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013).  The statute does not expressly define "false."  The Seventh Circuit has held that a statement is only "false" for FCA purposes if it represents "an objective falsehood."  *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) (citations omitted). "False" does not encompass "imprecise statements or differences in interpretation growing out of a disputed legal question" or "errors based simply on miscalculations or faulty reasoning."  *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (citations and internal quotation marks omitted).

The FCA defines "knowing" and "knowingly" to mean (1) actual knowledge, (2) deliberate ignorance, or (3) reckless disregard of the truth or falsity of information; the terms "require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).  "Innocent mistakes or negligence" do not satisfy the knowledge requirement.  *Yannacopoulous*, 652 F.3d at 838 (citations omitted).  Reckless disregard, the lowest actionable level of knowledge of falsity, requires a person to act with "gross negligence."  *See United States v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013) (citations omitted).  That is, reckless disregard occurs "'when the actor knows or has reason to know of facts that would lead a reasonable person to realize' that harm is the likely result of the relevant act."  *Id.* (quoting Black's Law Dictionary 540–41 (9th ed. 2009)).

The Government's allegations give rise to two theories under which KBR has made knowing false statements: (1) KBR failed to verify First Kuwaiti's costs according to the applicable contractual and regulatory standards before passing those costs along to the

Government, and (2) in seeking reimbursement, KBR made affirmative false statements regarding the accuracy and veracity of its and First Kuwaiti's claims.

### 1. Failure to Verify Costs

KBR claims that LOGCAP III and the FAR did not require it to verify First Kuwaiti's actual costs when it settled with First Kuwaiti or sought federal reimbursement; the contract permitted KBR to rely on other sources to determine that First Kuwaiti's prices were "reasonable." Def.'s Mem. in Supp. Mot. Dismiss 11. Therefore, KBR argues, its claims for reimbursement—which were verified through market comparison of prices in similar, contemporaneous subcontracts, *id.* at 11–12—cannot be considered "false or fraudulent" merely because they deviated from First Kuwaiti's actual costs.

The merits of this argument turn, at least in part, on construction of LOGCAP III's terms regarding KBR's price-adjustment reimbursement requirements. However, KBR counters the Government's allegations about the contract language solely through its own assertions. KBR did not attach the LOGCAP III agreement to its motion,[7] preventing the Court from interpreting the contract's provisions for supporting costs on this motion to dismiss. *See* Fed R. Civ. P. 10(c); *Rosenblum v. Travelbyus.com, Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (noting that a court only considers the complaint and exhibits to pleadings on a motion to dismiss); *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir.1994) ("[D]ocuments *attached* to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.") (emphasis added). Because the Court cannot interpret a contract in its absence, it is left with no other basis for deciding KBR's motion than the Government's

---

[7] While the parties submitted Subcontract 11, it does not define the contractual relationship between KBR and the Government.

allegations of LOGCAP III's performance requirements. *See Indep. Trust Corp.*, 665 F.3d at 934.

The Government alleges that "KBR had the right under Subcontract 11 to verify [First Kuwaiti's] costs and the obligation under LOGCAP III to do so." Am. Compl. ¶¶ 67, 73. Further, the Government alleges that Subcontract 11 incorporated FAR Part 31's cost procedures and principles governing price adjustments.[8] Am. Compl. ¶ 88. FAR Part 31, 48 C.F.R. § 31.201-2, provides that in a government contract with a commercial organization, a cost is only allowable when it complies with, among other conditions, "[r]easonableness." *Id.* § 31.201-2(a). A cost is reasonable "if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *Id.* § 31.201-3(a). Factors to be considered in determining reasonableness of costs include:

> (1) [W]hether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance; (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations; (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and (4) Any significant deviations from the contractor's established practices.

*Id.* § 31.201-3(b). Further, FAR Subpart 31.2 holds a contractor responsible "for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to

---

[8] The Court does not reach KBR's argument that it was only required to provide certified cost or pricing data in support of its claims for reimbursement under the FAR's "commercial item" exception. Def.'s Mem. in Supp. Mot. Dismiss 10; *see* 48 C.F.R. §§ 15.403-1(b)(3), 15.403-3(c). The Government pleaded that cost-reimbursement rules of FAR Part 31, not the price negotiation procedures of FAR Subpart 15.4 (which contain the commercial item exception), were incorporated into LOGCAP III to govern price adjustments under Subcontract 11. Am. Compl. ¶¶ 88–89; Pl.'s Resp. to Mot. Dismiss 17, ECF No. 26. Without the contract between the Government and KBR, the Court cannot determine the truth of this assertion, but must accept the Government's well-pleaded allegations as true in deciding this motion to dismiss. *See Indep. Trust Corp.*, 665 F.3d at 934. Further, KBR's reference to ACO Jerry Conroy's interim determination is unavailing both because that determination is not binding on the Court and because, although Conroy appears to indicate that Subcontract 11 was for commercial items, Def.'s Mem. in Supp. Mot. Dismiss, Ex. 1, ECF No. 25-1, KBR acknowledges that Conroy later reversed his initial determination that KBR had provided sufficient alternative support for its claims to qualify for the exemption, Def.'s Mem. in Supp. Mot. Dismiss 6.

demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements." *Id.* § 31.201-2(d).

According to the Complaint, KBR was both required to verify First Kuwaiti's costs under LOGCAP III and to settle First Kuwaiti's reimbursement claims in accordance with the FAR Part 31. A sampling of the Government's allegations include: internal KBR emails acknowledged that First Kuwaiti's price proposals were "exorbitant" and "too high," Am. Compl. ¶ 24; KBR received documents, such as copies of leases, *id.* ¶¶ 28–32, 50–52, and convoy logs, *id.* ¶ 55, from First Kuwaiti that were inconsistent with First Kuwaiti's cost claims; First Kuwaiti's credibility was undermined when its general manager's involvement in an illegal kickback scheme in other subcontracts with KBR came to light, *id.* ¶ 70; and KBR's knowledge of the terms of First Kuwaiti's deal with Red Sea, terms that made it impossible for the entire performance delay to be attributable to the Government, *id.* ¶ 18.

These allegations support the reasonable inferences that KBR failed both to verify First Kuwaiti's costs and to determine the amount of the REA claims in accordance with "sound business practices," *see* 48 C.F.R. § 31.201-3(b), by recklessly failing to require First Kuwaiti to prove its expenses in the face of evidence that First Kuwaiti was untrustworthy and the prices it claimed were likely inflated. Further, this alleged lack of inquiry into the discrepancies in First Kuwaiti's claims supports the inference that KBR failed to "maintain[] records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred." *See id.* § 31.201-2(d); Pl.'s Mem. in Opp. Mot. Dismiss 15–16, ECF No. 26. As a result, the Government has sufficiently alleged that KBR's claims for reimbursement based on costs passed through from First Kuwaiti did not meet the LOGCAP III or FAR standards for determining

costs attributable to the Government, and therefore KBR's claim that the Government owed it these sums under LOGCAP III and the FAR was false or fraudulent.

KBR argues that whether a cost is reasonable "is an inherently subjective determination turning on the contractor's exercise of business judgment." Def.'s Mem. in Supp. Mot. Dismiss 10, ECF No. 25 (citing *Telecomputing Servs., Inc.*, ASBCA No. 10655, 68-1 BCA ¶ 7023, at 32,466 (Apr. 25, 1968)). KBR claims it settled with First Kuwaiti and billed the Government according to a reasonable interpretation of the type of cost analysis required under LOGCAP III and the FAR. *Id.* at 14–15. KBR maintains it is, at most, guilty of adopting an interpretation over which reasonable minds may disagree, which by its nature cannot constitute an objective falsehood sufficient to support FCA liability. *See id.*

Reasonableness is relevant to, but cannot conclusively negate, knowledge of falsity for FCA purposes. *See United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) (citing *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999)). One can make an objectively reasonable claim he or she subjectively knows to be false. For example, an objectively reasonable interpretation may nevertheless be knowingly false if the speaker is cognizant of facts that undermine the basis for that interpretation. *See Yannacopoulos*, 652 F.3d at 833. Similarly, even an opinion or estimate may be fraudulent under the FCA if that estimate is made by one who knows of facts that preclude that estimate. *See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 733-34 (4th Cir. 2010), *cited in Yannacopoulos*, 652 F.3d at 833.

KBR cites certain Seventh Circuit cases that may suggest a reasonable contract interpretation cannot be fraudulent under the FCA. *See Yannacopoulos*, 652 F.3d at 836 (stating that mere "differences in interpretation growing out of a disputed legal question" do not give rise

to FCA liability) (citation omitted); *Lamers*, 168 F.3d at 1018 (noting that innocent mistakes and negligence are not actionable under the FCA) (citation omitted). But neither *Yannacopoulous* nor *Lamers* can be stretched so far as to broadly require dismissal of an FCA claim anytime a defendant claims he or she acted based on a reasonable contract interpretation. *See Chilcott*, 2013 WL 5781660 at *8.

    *Yannacopoulous* is distinguishable in that it was decided at the summary judgment stage. 652 F.3d at 821. As such, the case turned on the sufficiency of factual evidence of fraud and not merely the allegations in the pleadings, which the Court is confined to here. *Id.* at 837. Moreover, *Yannacopoulous* did not reject FCA liability because the conduct at issue was "reasonable," but because the plaintiff had not produced sufficient evidence that defendant was presenting a knowingly false claim. *Id.* *Lamers*, another summary judgment disposition, held that the allegedly fraudulent misrepresentations were either innocent oversights of technicalities by an entity with no motive to lie, or the result of confusion and so minor as to be immaterial under the FCA. 168 F.3d at 1019. Here, by contrast, the Government alleges KBR knew of but recklessly disregarded information that undermined the accuracy of material[9] facts underlying its claims for reimbursement.

### 2. Affirmative False Statements

    In addition to recklessly failing to meet the FAR cost-verification standard, the Government alleges that, in at least three of KBR's four false claims, KBR made false statements by affirmatively misrepresenting the accuracy or veracity of its cost claims.[10] *See* Am. Compl.

---

[9] The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Applied here, facts supporting a contract claim for payment would tend to influence payment of that sum.

[10] The other, False Claim No. 1, was KBR's initial billing for the double handling and delay REAs. The Government does not expressly plead that KBR made any similar affirmative false representations in submitting these claims. See Am. Compl. ¶ 63. These claims for reimbursement, however, still support an FCA cause of action for allegedly recklessly failing to comply with the FAR cost-determination standard, as described above.

¶¶ 64–79. That is, the Government alleges: KBR sought reimbursement for inflated amounts paid to First Kuwaiti that KBR claimed were "reasonable," *id.* ¶ 66; based on "adequate price analysis" provided by First Kuwaiti, *id.* ¶ 72; "accurately reflect[ed] the contract adjustment for which the contractor believes the government is liable," *id.* ¶ 76; and reflected First Kuwaiti's "actual costs" as verified by a KBR analyst, *id.* ¶ 78. The claim that KBR analysts verified First Kuwaiti's actual costs was straightforwardly contradicted by facts in KBR's knowledge, the Government alleges. *Id.* ¶ 44 (discussing KBR's alleged admission to DCAA that KBR did not review First Kuwaiti's accounting records).

Alleged statements that costs were "reasonable," "actual," or based on adequate analysis constitute false claims under the FCA due to KBR's alleged reckless failure to verify the truth of First Kuwaiti's claims in light of information suggesting that First Kuwaiti's claims were inflated, information of which KBR was or should have been aware[11] at the time it made each claim for payment. *See King-Vassel*, 728 F.3d at 713. Even the alleged KBR claim that costs "accurately reflect[ed] the contract adjustment for which the contractor believes the government is liable"—which more resembles an estimate or opinion than representation of fact—states a false claim for FCA purposes due to KBR's alleged possession of information that would preclude the accuracy of First Kuwaiti's estimates regarding the number of delay days attributable to the Government. *Id.* ¶ 61; *see Owens,* 612 F.3d at 733–34. To the extent that KBR's argument for dismissal implies that these statements are based on a reasonable interpretation of what claims of cost accuracy and veracity meant in the context of LOGCAP III

---

[11] The parties agree that KBR did not receive documentation showing some of First Kuwaiti's actual costs until December 21, 2006, after it had negotiated and settled on reimbursement figures with First Kuwaiti. Am. Compl. ¶¶ 32, 50; Def.'s Mem. in Supp. Mot. Dismiss 19. However, at that time the Government was still determining how much of KBR's costs to reimburse, and the Government claims KBR concealed this emerging proof of First Kuwaiti's actual expenses that showed the earlier figures to be inflated. Am. Compl. ¶ 68. These allegations, taken as true, give rise to a reasonable inference that KBR, at the least, was grossly negligent in disregarding information to which it had access and which undermined the truth of cost representations it had made that were material to the Government's ongoing decision-making process. *See King-Vassel*, 728 F.3d at 713.

and the FAR, any claim to objective reasonability is undermined by KBR's subjective knowledge of circumstances discrediting the accuracy of First Kuwaiti's representations. *See Yannacopoulos*, 652 F.3d at 833.

### 3. Policy Considerations

KBR argues that allowing the Government's FCA claims to proceed would open the door to abuse, allowing the Government to freely transform disputed issues in cost reimbursement contracts into fraud claims. Def.'s Mem. in Supp. Mot. Dismiss 20. Consequently, the forum for Government contract disputes would shift from the ASBCA and Court of Federal Claims to federal district courts in contravention of Congressional intent. *See* 41 U.S.C. § 7104; *United States v. Suntip Co.*, 82 F.3d 1468, 1474 (9th Cir. 1996) (circumventing agency board of contract appeals and Court of Federal Claims defeats Congressional intent to confine government contract disputes to expert tribunals created expressly for that purpose).

However, under KBR's approach, even the most egregious cases of fraud under the FCA would be dismissed where the contractor merely alleged a "reasonable interpretation" of a contract term to justify its false demand for payment. Moreover, the Court finds that the FCA's knowledge requirement grants contractors some protection from the proliferation of fraud claims. In the instant case, the Government plausibly alleges KBR had access to information that undermined the veracity of its representations. In contrast, contractors who, in good faith and without contrary information, seek reimbursement for claims that are later revealed to be inflated will not meet the "reckless disregard" benchmark. *See Chilcott*, 2013 WL 5781660 at *8 (citing *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998) ("If a contractor submits a claim based on a plausible but erroneous contract interpretation, the

contractor will not be liable, absent some specific evidence of knowledge that the claim is false or the intent to deceive."))

### 4. Sufficiency of FCA Claims: Summary

To survive a Rule 12(b)(6) motion to dismiss, the Government need only plead a "plausible" set of allegations—sufficient to create a reasonable inference, when assuming all stated facts in the Government's favor—that KBR acted in reckless disregard for whether its claims were based on false information. *See Iqbal*, 556 U.S. at 678. The Government has alleged that KBR made false statements by submitting cost claims that did not comport with LOGCAP III and the FAR's cost-determination standards, and by affirmatively misrepresenting the accuracy and veracity of its claims based on First Kuwaiti's figures. The Government further alleges facts that give rise to the reasonable inference that KBR recklessly disregarded evidence undermining the truth of these statements by passing along First Kuwaiti's costs for Government reimbursement despite failing to verify First Kuwaiti's claims when KBR learned, or should have learned, that those claims were likely inflated. Accordingly, the Government has sufficiently alleged that KBR submitted false or fraudulent claims to state causes of action under the FCA.

### 5. Rule 9(b)'s Heightened Pleading Standard

KBR also briefly asserts that the FCA claims fail to meet Rule 9(b)'s heightened pleading standard. The Federal Rules of Civil Procedure require that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) sets the pleading standard for any claim that "sounds in fraud," i.e., that is "premised on a fraudulent course of conduct." *Perelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011) (citation omitted). As an anti-fraud statute, FCA claims are

subject to Rule 9(b). *U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 920 (7th Cir. 2009). The Government's CDA claim also sounds in fraud as it is brought under the CDA's antifraud provision. That provision holds a contractor liable for failure to support a claim where such failure is "attributable to a misrepresentation of fact or fraud by the contractor." 41 U.S.C. § 7103(c)(2).

Rule 9(b) requires that the party alleging fraud provide the "who, what, when, where and how." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)) (internal quotation marks omitted). Accordingly, the Government must allege (1) the identity of the person who made the misrepresentation, (2) the time, place, and content of the misrepresentation, and (3) the method by which the misrepresentation was communicated to it. *Windy City Metal Fabricators v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008) (citation omitted).

Despite invoking Rule 9(b), KBR fails to develop this argument, and therefore it is effectively waived. *See United States v. Holm*, 326 F.3d 872, 877 (2003) ("'[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'" (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991))). Moreover, this argument is without any merit. The Government's Complaint details the dates, methods of communication, parties involved, and content of KBR's alleged knowing misrepresentations and fraudulent withholding of material information. Am. Compl. ¶¶ 7–79. The allegations underlying KBR's "reverse false claim" exemplify the specificity that characterizes each of the Government's claims. The Government alleged that in a July 18, 2008 letter, KBR sought to reverse the ACO's May 19, 2008 decision by falsely claiming there was "ample evidence of the

reasonableness of [the two REA claims] by KBR which came from independent sources" and that KBR "independently verified facts relating to the issues involved and the damages incurred." *Id.* ¶¶ 70–73. The detailed allegations in this and the other FCA claims more than suffice to "reasonably notify the defendants of their purported role in the scheme." *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 778 (7th Cir. 1994). The Government's fraud claims meet the Rule 9(b) heightened pleading standard.

### 6. Rule 12(b)(1) Dismissal for Lack of Subject Matter Jurisdiction

Finally, KBR maintains that Counts VI and VII—for violation of the CDA and common law breach of contract, respectively—are contract disputes over which federal district courts lack subject matter jurisdiction, particularly if the FCA claims are dismissed. Def.'s Mot. Dismiss 1–2 n.1, ECF No. 24; Def.'s Mem. in Supp. Mot. Dismiss 12 n.7. Under the CDA, agency boards of contract appeals and the Court of Federal Claims have jurisdiction over appeals from ACO decisions concerning government contract disputes. 41 U.S.C § 7104. Correspondingly, district courts lack jurisdiction over "express or implied contract" claims against the United States as well as non-tort damages claims brought under the CDA, 41 U.S.C. §§ 7104(b)(1) and 7107(a)(1). 28 U.S.C. § 1346(a)(2).

However, the CDA's jurisdictional bar exempts fraud claims. 41 U.S.C. § 7103(c)(1) ("This section does not authorize an agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud."). The CDA provides for "any claim involving fraud" to be brought directly in federal district court, bypassing the usual contract dispute resolution process which requires claims first to be presented to an ACO. *See id.*; *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 545 (Fed. Cir. 1988).

The Government's CDA claim is brought under the CDA's antifraud provision, 41 U.S.C. § 7103(c)(2), and KBR does not argue that the Government fails to state a claim under section 7103(c)(2). Both the FCA and CDA antifraud claims fall within the CDA's jurisdictional exemption for fraud. *Martin J. Simko Constr., Inc.*, 852 F.2d at 544–48 (finding that Congress intended to exempt CDA anti-fraud and FCA claims from CDA's jurisdictional restriction).

A federal district court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims that "derive from a common nucleus of operative fact" with the claims over which it has original jurisdiction. *Houskins v. Sheehan*, 549 F.3d 480, 495 (7th Cir. 2008) (citation and internal quotation marks omitted). The Government's claims share a common factual nucleus in that they all arise from KBR's pursuit of reimbursement under LOGCAP III for services provided through Subcontract 11. Because the Court has jurisdiction over the FCA and CDA claims, the Court has supplemental jurisdiction over the breach of contract claim pursuant to 28 U.S.C. § 1367(a). *See United States v. Quad City Prosthetic, Inc.*, No. 06-4015, 2011 WL 3273142, at *1 (C.D. Ill. Aug. 1, 2011) (holding that court considering FCA claims had supplemental jurisdiction over state unjust enrichment and false claims causes of action). Accordingly, the Court has subject matter jurisdiction over all the claims in this case.

## CONCLUSION

Defendant KBR's Renewed Request for Hearing on Defendants' Motion to Dismiss, ECF No. 48, is DENIED. KBR's Motion for Leave to Reply to Government's Opposition to KBR's Motion to Dismiss, ECF No. 30, is GRANTED. KBR's Motion to Dismiss Complaint, ECF No. 24, is DENIED.

Entered this 31st day of March, 2014.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE