UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-cv-4110-SLD-JAG |
| | ) | |
| KELLOGG BROWN & ROOT SERVICES, | ) | |
| INC.; KELLOGG BROWN & ROOT LLC; | ) | |
| OVERSEAS ADMINISTRATION | ) | |
| SERVICES, LTD.; FIRST KUWAITI CO.; | ) | |
| FIRST KUWAITI TRADING COMPANY; | ) | |
| FIRST KUWAITI TRADING AND | ) | |
| CONTRACTING; FIRST KUWAITI | ) | |
| GENERAL TRADING & CONTRACTING | ) | |
| COMPANY; FIRST KUWAITI GENERAL | ) | |
| TRADING & CONTRACTING | ) | |
| COMPANY, W.L.L.; FIRST KUWAITI | ) | |
| TRADING AND CONTRACTING, W.L.L.; | ) | |
| and FIRST KUWAITI GENERAL | ) | |
| CONTRACTING & TRADING | ) | |
| COMPANY, W.L.L.; | ) | |
| | | |
| Defendants. | | |

## ORDER

Plaintiff United States of America claims that contractor Kellogg Brown & Root Services, Inc. ("KBR")[1], its subsidiary, Overseas Administrative Services, Ltd. ("OAS"), and its subcontractor, First Kuwaiti Trading Company (in its various incarnations, collectively "First Kuwaiti"), inflated the costs of providing living quarters for American troops in Iraq. Before the Court are Defendant First Kuwaiti's Motion to Dismiss, ECF No. 50, and Defendant OAS's Motion to Dismiss, ECF No. 60. Defendants request hearings on their motions; because the pleadings sufficiently present the issues, however, the requests for hearings, are DENIED. First

---

[1] Specifically, the Government has named as defendants Kellogg Brown & Root Services, Inc., and its successor Kellogg Brown & Root LLC, who will be collectively referred to as "KBR."

Kuwaiti Motion for Hearing, ECF No. 53; OAS Motion to Dismiss 1, ECF No. 60. First Kuwaiti's Motion for Leave to File a Supplemental Memorandum in Support of its Motion to Dismiss, ECF No. 56, is GRANTED. KBR's Motion for Leave to Respond to United States' Opposition to First Kuwaiti's Motion to Dismiss Complaint, ECF No. 57, is DENIED. For the following reasons, Defendant First Kuwaiti's Motion to Dismiss is GRANTED, and Defendant OAS's Motion to Dismiss is DENIED.

## BACKGROUND[2]

On December 14, 2001, the U.S. Army awarded the Logistics Civil Augmentation Program III ("LOGCAP III") contract to KBR[3] for the provision of support services in the Iraqi military theater. KBR is a Delaware corporation with its principal place of business in Texas. OAS, a wholly owned subsidiary of KBR incorporated in the Cayman Islands and headquartered in Dubai, employed most of KBR's administrators working on LOGCAP III in Iraq and Kuwait. LOGCAP III is an umbrella contract for indefinite delivery of an indefinite number of services. Much of KBR's work under LOGCAP III was performed through subcontractors; KBR paid them for the actual cost of their services and sought reimbursement from the Government for this amount, plus a 1% base fee and a discretionary award of up to 2%.

Under LOGCAP III, KBR was to "provide, setup, operate and maintain" 2,252 living trailers at Camp Anaconda in Iraq no later than December 15, 2003. On October 16, 2003, KBR awarded Subcontract 11 to First Kuwaiti—a Kuwait-based contractor—to provide, deliver, and install 2,252 living trailers at Camp Anaconda by December 15, 2003. Subcontract 11 provided

---

[2] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted). Accordingly, except where otherwise noted with a specific docket reference, the statement of facts in this section is based solely on allegations in the Government's First Amended Complaint, ¶¶ 7–90, ECF No. 3. This section presents a condensed version of these allegations, which were discussed in full in the Court's Order of March 31, 2014, ECF No. 66.

[3] The Government includes OAS in all allegations made against KBR. *See* Am. Compl. ¶ 5.

that payment by the United States to KBR was a condition precedent to KBR's payment to First Kuwaiti. Pl.'s Mot. for Lv. File Reply, Ex. 1 at 38, ECF No. 30-1. First Kuwaiti later presented several requests to KBR for equitable adjustment ("REA") of the subcontract price based on delays that occurred in performing Subcontract 11.

## I.    Requests for Equitable Adjustment

In May and June 2004, First Kuwaiti submitted four REAs for "repair costs and double-handling" due to alleged Government-caused delays; these four REAs were later consolidated into a single "double handling" REA totaling $30,638,102. First Kuwaiti claimed that it had to hold the trailers at temporary storage locations due to convoy and site-preparation delays. To accomplish this, First Kuwaiti leased land, cranes, and other equipment and hired personnel it otherwise would not have needed; the increased handling also resulted in damage to the trailers, which First Kuwaiti had to repair. KBR and First Kuwaiti eventually settled the double handling REA for $23,831,147.25, which the Government claims included "millions of dollars more" for cranes and repairs than was supported by First Kuwaiti's actual crane costs and KBR's independent evaluation, respectively. KBR billed the Government for this REA.

On July 15, 2004, First Kuwaiti submitted a "delay" REA for the costs of 83,942 days of idle truck and driver time due to the delay, all of which it attributed to the Government. On August 4, 2004, First Kuwaiti submitted a revised delay REA and claimed its "actual costs" for the idle trucks and drivers, as supported by lease invoices and verified by KBR, was $500 per day. Despite information in First Kuwaiti's truck leases and invoices and convoy logs that suggested lower actual costs, and evidence that the companies were seeking reimbursement for more delay days than were attributable to Government fault, KBR and First Kuwaiti agreed to

settle the delay REA for $24,923,400 based on 83,078 delay days at $200 a day for trucks and $100 a day for drivers. KBR sought reimbursement from the Government based on this amount.

On August 31, 2004, KBR billed the Government $48,754,547.25 for its costs attributable to the double-handling and delay REAs, plus related fees and costs, which the Government paid in September 2004. By March 17, 2006, the Defense Contract Audit Agency had suspended and disapproved this payment as unsupported. However—after KBR represented that First Kuwaiti's truck costs were "reasonable," while failing to disclose the actual leases—an Administrative Contracting Officer ("ACO") at the Defense Contract Management Agency ("DCMA") issued an Interim Determination provisionally reinstating $25,564,516 of the payment on December 29, 2006. On June 20, 2008, another ACO reversed the Interim Determination after concluding that the supporting information provided by First Kuwaiti lacked credibility because a kickback scheme between KBR and First Kuwaiti employees had come to light.[4]

On July 18, 2008, KBR sent a letter to the ACO claiming that KBR "independently verified" the claims and "adequate price analysis was provided" to determine the reasonableness of the delay costs. On November 4, 2010, KBR submitted a certified claim to an ACO pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–09, for the costs of the double handling and delay REAs, attesting that the claim was "made in good faith," the "supporting data were accurate and complete to the best of [his] knowledge and belief," and the "amount requested accurately reflect[ed] the contract adjustment for which [KBR] believe[d] the Government is liable . . . ." The final ACO decision on July 29, 2011, ordered KBR to refund

---

[4] In July 2007, KBR Subcontract Administrator Anthony Martin pleaded guilty to agreeing to receive kickbacks from First Kuwaiti General Manager Wadhi Al Absi in return for awarding First Kuwaiti other subcontracts for trucks and trailers under LOGCAP III, a revelation that allegedly tarnished First Kuwaiti's credibility. *See United States v. Martin*, No. 07-cr-40042 (C.D. Ill. July 13, 2007).

the Government $21,781,512, thereby providing KBR only $3,783,005 in total reimbursement on the REAs.

## I.    First Kuwaiti's Contact With United States

According to Wadih Al Absi, a Kuwaiti resident and general manager of First Kuwaiti, First Kuwaiti is a construction and general contracting firm that was incorporated in Kuwait in 1996. Al Absi Aff. ¶¶ 2–5, ECF No. 50-1. First Kuwaiti conducts most of its work in the Middle East, but it has also performed projects in Indonesia and Gabon. *Id.* ¶ 6. Although it performed one project under direct contract with the United States—building the U.S. embassy in Baghdad in 2005 to 2008—and was subcontractor on three other U.S. consulate construction projects, First Kuwaiti has never performed work within the United States. *Id.* ¶¶ 7, 10–11. According to Al Absi, First Kuwaiti owns no property and has no offices, no employees or agents, and no telephone listing or mailing address within the territorial United States; it is not licensed to do business in any United States jurisdiction. *Id.* ¶¶ 8, 12–15. First Kuwaiti does not pay taxes to the United States, and has no designated agent for service of process within the United States. *Id.* ¶¶ 16–17.

Al Absi additionally claims that negotiations on Subcontract 11, to which the United States was not a party, occurred entirely within Iraq or Kuwait; KBR's representatives in those negotiations—Jacob Matovinovic, Craig McGinnis, and Donald Bailey—and its primary point of contact during performance of Subcontract 11 were based in Iraq; Subcontract 11 was performed outside the territorial United States; and at no point did any First Kuwaiti employee travel there on business related to Subcontract 11. *Id.* ¶¶ 18–23. First Kuwaiti received payments on Subcontract 11 at the National Bank of Kuwait in Kuwait City, and Al Absi said his

"understanding" is that KBR made those payments from its own account at the National Bank of Kuwait. *Id.* ¶ 24.

Jerry Conry, an ACO who administered LOGCAP III, states in an affidavit that in order to obtain additional information regarding First Kuwaiti's use of trucks as claimed in an REA, he participated in a telephone conference organized by KBR on December 14, 2006. Conry Aff. ¶¶ 4–5, ECF No. 54-1. Conry "understood that [KBR's representatives] were gathered in a conference room at KBR, and had Samir Ida, a First Kuwaiti employee, present with them in the conference room." *Id.* ¶ 5. Conry notes that KBR representatives relayed his questions to Ida, who answered some of his questions and promised to answer others at a later date. *Id.* ¶ 5. In his own declaration, however, Ida says he "does not recall ever visiting" a KBR office in the United States or traveling to the United States for the December 14, 2006 phone conference, which he claims he participated in remotely. Ida Aff. ¶¶ 3–5, ECF No. 56-2. Ida claims First Kuwaiti business records "confirm [his] recollection" about the December 14, 2006 teleconference. *Id.* ¶ 6. In a December 14, 2006 email from Ida to KBR's Kurt Miller, Ida indicates that he will be accessing the conference call from Kuwait. First Kuwaiti Mot. for Lv. File Supp. Mem., Ex. 3, ECF No. 56-3.

In his deposition, KBR's Needham states that he "think[s]" he met with Samir inside the United States once, "possibly in the '06-'07 timeframe, maybe—I am not really sure," at a KBR office in either Houston or Virginia. Needham Dep. 300:12–301:3, ECF No. 54-2. In a December 21, 2006 email from Ida to Needham, Ida provides First Kuwaiti records pertaining to truck lease agreements in response to "(DCMA) questions and our discussions with the contracting officer." Pl.'s Resp. to Mot. Dismiss, Ex. 2B at 1, ECF No. 54-2. The declaration of Government attorney John Kolar—who deposed Needham—indicates that Ida was referring to

ACO Conry's request for additional information at the December 14, 2006 phone conference. Kolar Aff. ¶ 3, ECF No. 54-2; *see* Pl.'s Resp. to First Kuwaiti Mot. Dismiss 12.

## II.     Procedural History

KBR appealed the final ACO decision to the Army Services Board of Contract Appeals ("ASBCA") in August 2011, but that action was dismissed without prejudice when the Government filed the instant fraud-based suit on November 20, 2012. Def.'s Mem. in Supp. Mot. Dismiss 6, ECF No. 25. The Government alleges that the REAs and supporting statements submitted by KBR, OAS, and First Kuwaiti constituted (1) false or fraudulent claims for payment by the United States, or false statements in support of such claims, under 31 U.S.C. § 3729(a)(1)-(2) (2000) and 31 U.S.C. § 3729(a)(1) (2006 & Supp. III 2009); (2) false records or statements made to conceal, avoid, or decrease an obligation to pay the United States under 31 U.S.C. § 3729(a)(7) (2000); and (3) a conspiracy to defraud the United States by submitting false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(3) (2000) and 31 U.S.C. § 3729(a)(1)(C) (2006 & Supp. III 2009).[5] The Government additionally alleges that KBR and OAS violated the CDA, 41 U.S.C. § 7103(c), by submitting a fraudulent certified claim to an ACO, and committed breach of contract.[6]

On March 4, 2013, KBR moved for change of venue to the Eastern District of Virginia, which the Court denied. After unsuccessful attempts via conventional means of service, on September 11, 2013, the Court authorized the Government to serve First Kuwaiti through two attorneys at a Washington, D.C. firm who have represented one First Kuwaiti entity, First

---

[5] Some offenses are alleged under an earlier version of the U.S. Code because the conduct underlying those offenses occurred prior to § 3729(a)'s revision in 2009. *See* Pub L. 111-21, § 4(a)(1). The revised version applies only to conduct occurring on or after May 20, 2009. *See id.* § 4(f).

[6] These final counts are brought against "KBRSI," not "KBR," the appellation the Government expressly stated would refer to OAS as well. *See* Am. Compl. ¶ 5. Nevertheless, for purposes of this motion to dismiss, the Court construes these latter claims to cover OAS as well because the Government appears to use the acronyms "KBR" and "KBRSI" interchangeably throughout the Amended Complaint.

Kuwaiti Trading & Contracting, WLL, but were not authorized by First Kuwaiti to waive service on its behalf. Sept. 11, 2013 Order 3, ECF No. 40. Despite the limited nature of their representation and lack of express authorization, based on evidence that these lawyers were in communication with the First Kuwaiti entity, the Court found that they would have the ability and incentive to notify the common First Kuwaiti manager of the Government's suit. *Id.* at 6–7. KBR, First Kuwaiti, and OAS filed separate motions to dismiss the claims against each on May 6, 2013, December 23, 2013, and February 12, 2014, respectively. On March 31, 2014, the Court denied KBR's motion to dismiss. Now before the Court are the motions to dismiss filed by First Kuwaiti and OAS.

## DISCUSSION

### I.     First Kuwaiti's Motion to Dismiss

First Kuwaiti argues that all of the Government's claims against it must be dismissed because the Court lacks personal jurisdiction over First Kuwaiti and because the Government fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). First Kuwaiti additionally argues for dismissal of the FCA conspiracy claim because the Government failed to plead the alleged conspiracy with the particularity required by Federal Rule of Civil Procedure 9(b). Because the Court finds that it lacks personal jurisdiction over First Kuwaiti, it does not reach First Kuwaiti's remaining arguments.

### A.  Personal Jurisdiction[7]

#### 1.  Legal Framework

The plaintiff bears the burden of establishing personal jurisdiction. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). When challenged at the motion to dismiss stage, the plaintiff

---

[7] Because the FCA authorizes nationwide service of process, 31 U.S.C. § 3732(a), the Court looks to First Kuwaiti's contact with the United States as a whole to determine whether personal jurisdiction exists. *See* Fed. R. Civ. P. 4(k)(1)(C); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671–72 (7th Cir. 1987).

must make a prima facie showing of facts establishing personal jurisdiction. *Id.* The court must accept as true all of the complaint's well-pleaded allegations, unless controverted by affidavit, but disputes between affidavits are resolved in the plaintiff's favor. *Id.*; *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987), *superseded on other grounds as recognized in FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 n.5 (7th Cir. 1990).

Due process prevents a court from subjecting a defendant to judgment unless the defendant has "sufficient 'minimum contacts' with [the forum jurisdiction] such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo v. Dworkin*, 601 F.3d 693, 700–01 (7th Cir. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Even if a defendant's contacts with the forum are not "sufficiently extensive and pervasive to approximate physical presence" and thus confer general personal jurisdiction, a court may still exercise specific personal jurisdiction if those contacts arise out of or relate to the conduct at issue in the case. *Felland*, 682 F.3d at 673 (quoting *Tamburo*, 601 F.3d at 701); *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). Specific personal jurisdiction requires that: (1) the defendant "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed his activities at the state"; (2) the injury arose from the defendant's forum related activities; and (3) exercising jurisdiction does not violate traditional notions of fair play and substantial justice. *Felland*, 682 F.3d at 673 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Whether the court examines purposeful availment versus purposeful direction depends largely on the type of claim. *Id.* at 674. In contract suits, the focus is on whether the defendant purposeful availed itself of the privilege of conducting business in the forum; with tort actions, courts instead inquire whether the conduct giving rise to the claim was purposefully directed at

the forum. *Id.* Conduct is "purposefully directed" where it is (1) intentional, (2) expressly aimed at the forum jurisdiction, (3) performed with knowledge that its effects would be felt there. *Id.* (citing *Tamburo*, 601 F.3d at 703). A defendant need not actually enter the forum so long as its efforts are directed there. *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003) (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)). "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011).

The effects of an alleged tort are part of, not a substitute for, the analysis of the defendant's minimum contacts with the forum. *Medallion Prods., Inc. v. H.C.T.V., Inc.*, No. 06 C 2597, 2007 WL 3085913, at *6 (N.D. Ill. Oct. 18, 2007) (citing *Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985)). "Whether these effects, either alone or in combination with other contacts, are sufficient to support in personam jurisdiction will turn upon the particular facts of each case." *Wallace*, 778 F.2d at 395. Experiencing the effects of an injury in a forum on its own is insufficient under a tort theory absent "something more directed at that [jurisdiction]." *Tamburo*, 601 F.3d at 706. As the Supreme Court recently explained in the context of intentional tort cases:

> [A]n injury is jurisdictionally relevant only insofar as it shows the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

*Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014).

## 2. Minimum Contacts Analysis

The Government does not attempt to establish that the Court has general personal jurisdiction over First Kuwaiti. *See* Pl.'s Resp. to First Kuwaiti Mot. Dismiss 5 & n.2. The issue turns on the presence or absence of specific personal jurisdiction.

The Court must first determine what facts support the basis for personal jurisdiction over First Kuwaiti. First Kuwaiti's general manager declares that First Kuwaiti negotiated, executed, performed, and received payment on Subcontract 11 entirely in Iraq and Kuwait, and only met with KBR representatives stationed in the Middle East. First Kuwaiti Mem. in Supp. Mot. Dismiss 8, ECF No. 51; *see* Al Absi Aff., ECF No. 50-1. The Government disputes Al-Absi's claim that no FIRST KUWAITI employees traveled to the United States on Subcontract 11 business, arguing that Conry's declaration and Needham's testimony establish that First Kuwaiti's Ida was present in the United States for at least the December 14, 2006 phone conference on Subcontract 11. Pl.'s Resp. to First Kuwaiti Mot. Dismiss 11–12, ECF No. 54.

At this stage, the Court must resolve factual disputes in jurisdictional affidavits in the Government's favor. *See Felland*, 682 F.3d at 672. Conry and Kolar's affidavits do not in fact dispute First Kuwaiti's evidence that Ida participated in the December 14, 2006 call from Kuwait, as Conry himself was a call-in participant and not able to see whether Ida was present with the KBR team in Houston or also calling in. Indeed, Conry notes that the KBR representatives relayed his questions to Ida, a dynamic less likely to occur if Ida was physically present and KBR staff could indicate with nonverbal cues that Ida should answer a particular Conry question. Conry and Kolar's affidavits are consistent with both parties' claims that Ida participated in the phone conference but shed no light on Ida's physical location at the time.

Needham's uncertain testimony about a meeting with Ida that may or may not have occurred also fails to indicate whether this possible meeting related to Subcontract 11 or the events underlying this case. Even if the Government's affidavits created a factual dispute with those of First Kuwaiti regarding Ida's presence in the United States on Subcontract 11 business, resolving the affidavit dispute in the Government's favor, as the Court must at this stage, still leaves extant Ida's December 14, 2006 email. The Government provides no evidence to dispute the authenticity or substance of Ida's email attesting to his presence in Kuwait on December 14, 2006. The Government, therefore, has failed to make a prima facie showing that an First Kuwaiti employee traveled to the United States for the teleconference on Subcontract 11.

The Complaint alleges that on September 10, 2008, First Kuwaiti's "legal counsel in the United States" sent a letter to another ACO urging him to reverse his decision requiring KBR to repay REA payments. Am. Compl. ¶ 74; Pl.'s Resp. to First Kuwaiti Mot. Dismiss 12. The Court has noted evidence that one of the First Kuwaiti incarnations, at least as of August 2013, employed attorneys at the law firm of Jones Day in Washington, D.C., to represent it in negotiating and appealing denial of 62 claims submitted to the Department of State in 2011 and 2012 in connection with the Baghdad embassy construction contract. Sept. 11, 2013 Order 3, ECF No. 40. However, that counsel denies having authorization to waive receipt of process on First Kuwaiti's behalf. *Id.*

As for First Kuwaiti's alleged September 10, 2008 letter to an ACO in Texas, sending a letter to a recipient inside a forum is on its own insufficient to confer personal jurisdiction there. *See, e.g., Int'l Med. Grp., Inc. v. Am. Arbitration Ass'n, Inc.*, 312 F.3d 833, 847 (7th Cir. 2002) (holding that sending three letters to recipients inside forum was insufficient for personal jurisdiction); *Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F. Supp. 2d 918,

926 (N.D. Ill. 2002) (collecting cases holding that telephone calls and mail correspondence into forum are generally insufficient to confer personal jurisdiction). Even if the letter was sent on First Kuwaiti's behalf by counsel it retained in Washington, D.C., with the exception of that isolated occurrence, the attorney-client relationship at that time pertained to a different contract and legal claims than are at issue here. That the nature of this agreement for legal services did not authorize the D.C. firm to waive receipt of process on First Kuwaiti's behalf further weighs against considering this relationship a purposeful contact with the subject forum.

On these facts, the Government fails to show sufficient minimum contacts between First Kuwaiti and the jurisdictional United States arising from or related to the alleged fraudulent REA claims. *See Felland*, 682 F.3d at 673. That an attorney retained in the forum on a different matter sent a letter on First Kuwaiti's behalf, even coupled with phone calls into the United States related to Subcontract 11, does not establish that First Kuwaiti had sufficient, purposeful contact with the jurisdictional United States to justify finding a meaningful connection between defendant and forum. *See Walden*, 134 S. Ct. at 1125.

### 3. "Bank Shot" Theory

Regardless of First Kuwaiti's other contacts with the forum, the Government argues, the dispositive inquiry in this tort-like FCA case is whether First Kuwaiti conduct allegedly causing KBR's false claims for reimbursement was purposely directed at the forum. Pl.'s Resp. to First Kuwaiti Mot. Dismiss 7–8 (quoting *Felland*, 682 F.3d at 674). First Kuwaiti allegedly billed KBR for inflated performance costs knowing that KBR had to seek United States reimbursement of these amounts in order to pay First Kuwaiti, and would thus submit claims on the basis of First Kuwaiti's inflated figures to contracting officials in the United States. Under this "bank shot" theory— First Kuwaiti "banked" its false claims off of KBR toward the United States—

First Kuwaiti's "direct and purposeful connection to the submission of these false claims" satisfies the minimum-contacts test, the Government argues. *Id.* at 7; *see Tamburo v. Dworkin*, 601 F.3d 693, 707 (7th Cir. 2010) (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075 (10th Cir. 2008) (finding the requisite "express aiming" for specific jurisdiction where foreign defendant's conduct toward intermediary in a third location caused injury to defendant in the forum, analogizing to a shot off the backboard in basketball)).

It is more appropriate to say, based on these facts, that First Kuwaiti purposefully directed its alleged inflated claims to KBR, and such claims only affected the United States Government due to KBR's independent decision to bill the Government on their basis. *See Walden*, 134 S. Ct. at 1125 (noting that unilateral activity by third party does not create contact with forum). In the case giving rise to the "bank shot" theory, the intermediary lacked discretion over its rebound effect because the defendant invoked an automatic procedure against the plaintiff. *See Dudnikov*, 514 F.3d at 1075. By contrast, here the Government's allegations indicate that KBR had discretion: KBR possessed and exercised the power to negotiate REA amounts with First Kuwaiti and, of course, KBR could have refused to submit claims that KBR discovered were false to the Government. As a result, First Kuwaiti could not necessarily anticipate that the inflated portion of any REA would make it through KBR to reach the United States. In other words, unlike in *Dudnikov*, First Kuwaiti was shooting against a backboard with a mind of its own.

Moreover, First Kuwaiti did not control whether KBR submitted its allegedly false claims to United States contracting officers stationed at home or abroad. Even if the "bank shot" rationale applied here, First Kuwaiti's alleged false claims would only target the United States Government; they were not directed at the economy or society of the territorial United States

whatsoever. *See J. McIntyre Mach., Ltd.*, 131 S. Ct. at 2789. The fact that the victim, here the Government, "lives" in the forum is irrelevant if the injury does not "show that the defendant has formed a contact with the forum State." *Walden*, 134 S. Ct. at 1125. The Government, as illustrated, has made no such showing.

### 4. Conspiracy Theory

The Government argues that the Court has an alternative basis for personal jurisdiction over First Kuwaiti: the so-called conspiracy theory of personal jurisdiction. Pl.'s Resp. to First Kuwaiti Mot. Dismiss 13. Under this theory, a court may exercise personal jurisdiction over a foreign defendant in a forum where a co-conspirator acted as the defendant's agent in furtherance of the conspiracy. *Smith v. Jefferson Cnty. Bd. Of Educ.*, 378 F. App'x 582, 585 (7th Cir. 2010) (citing *Davis v. A&J Elecs.*, 792 F.2d 74, 75–76 (7th Cir. 1986)). In order to satisfy due process under the conspiracy theory, a plaintiff must allege an actionable conspiracy and a substantial act furthering that conspiracy performed within the forum. *Flag Co. v. Maynard*, 376 F. Supp. 2d 849, 854–55 (N.D. Ill. 2005) (citing *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983)).

While some district courts are applying this theory, the Seventh Circuit, as recently as 2010, has noted that the conspiracy theory, "already marginal at best," may not comport with due process requirements. *Smith*, 378 F. App'x at 586. The Court need not determine the constitutional issue, however, because the Government has failed to sufficiently allege the existence of a conspiratorial agreement to support this jurisdictional theory.

General civil conspiracy principles apply to FCA conspiracy claims, which are based on an agreement between co-conspirators to defraud the Government. *See* 31 U.S.C. § 3729(a)(1)(C); 31 U.S.C. § 3729 (a)(3)(2000); *Allison Engine Co., Inc. v. United States ex rel.*

*Sanders*, 553 U.S. 662, 672 (2008); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 & n.3 (7th Cir. 1999). The Government need not provide direct evidence of an agreement, but may establish it through circumstantial evidence alone. *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980). To do so, the Government must show that "there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* (internal quotation omitted). The co-conspirators must "share the general conspiratorial objective." *Id.* A "meeting of the minds" must occur; the parties must "ha[ve] an understanding to achieve the conspiracy's objectives." *See Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002) (finding no evidence to support civil conspiracy claim under § 1985).

The Government has no obligation to produce evidence of a conspiratorial agreement at this stage, but it must at least allege factual material from which the Court can reasonably infer one existed. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2008). The Complaint's only allegation directly on point is its formulaic recitation that Defendants conspired to submit false claims in violation of the FCA. Am. Compl. ¶ 104. This legal conclusion is not a factual allegation that can support an inference of conspiracy. *See Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Government argues that the supposedly arms-length negotiations where First Kuwaiti and KBR agreed to settle the REAs at what each knew were unsupported, inflated rates "were really the instances of agreement to defraud the [G]overnment." Pl.'s Resp. to First Kuwaiti Mot. Dismiss 22–23. While the Government's allegations may support the plausible inference that First Kuwaiti submitted inflated costs to KBR, and that KBR knowingly or recklessly failed to verify those costs before billing the Government, the allegations do not

support an inference that there was a meeting of the minds or common plan between First Kuwaiti and KBR to defraud the Government. If anything, the Complaint's allegations suggest that First Kuwaiti and KBR were often working at cross-purposes: the Government claims that, on multiple occasions, KBR employees rejected and succeeded in lowering the rates charged by First Kuwaiti. *See, e.g.,* Am. Compl. ¶ 45 (alleging that KBR Senior Subcontract Administrator Charles Hutchins told First Kuwaiti that $500 per day idle truck rate was unreasonably high and reduced both rate and number of delay days First Kuwaiti sought payment for).

The Government points to First Kuwaiti's September 10, 2008 letter to the ACO, stating that the REA costs were reasonable and KBR should be reimbursed, as an indication of Defendants' conspiracy. Pl.'s Resp. to First Kuwaiti Mot. Dismiss 23–24; Am. Compl. ¶ 74. However, the fact that the letter was sent does not, on its own, suggest an agreement between First Kuwaiti and KBR to defraud the Government through its claims. Because its payment under Subcontract 11 depended on the United States' reimbursement of KBR, First Kuwaiti would likely have sent the same self-serving letter if KBR had only negligently, or in good faith, passed First Kuwaiti's inflated costs along to the Government—that is, if KBR was acting as a law-abiding general contractor, absent any fraud on its part or agreement with First Kuwaiti to engage in fraud. *See Twombly*, 550 U.S. at 567–68 (finding no plausible inference of unlawful agreement where alleged conduct was at least equally compatible with unchoreographed behavior). The Government's formulaic claim that First Kuwaiti sent this letter "in collusion with KBR to conceal, avoid, or decrease KBR's obligation to pay the Government," Am. Compl. ¶ 75, is a legal conclusion the Court may not consider when drawing plausible inferences from the Government's factual allegations. *See Iqbal*, 556 U.S. at 678.

The Government's references to the kickback scheme between KBR's Martin and First Kuwaiti's Al-Absi are also irrelevant to pleading a conspiracy agreement, as the Government does not allege that the scheme—concerning other subcontracts awarded under LOGCAP III— had any connection to Subcontract 11 or that any kickbacks are involved here. *See* Am. Compl. ¶ 70. At most, the Government's allegations support inferences that First Kuwaiti and KBR, manifesting different levels of consciousness of the falsity of their representations, separately violated the FCA to achieve each's individual ends. The Government does not allege any specific agreement to do so jointly, and the circumstantial evidence the Government points to is far more consistent with a theory of independent, sometimes mutually opposed, actors. Under the Government's allegations, First Kuwaiti and KBR shared an economic enterprise in the form of Subcontract 11, but not a common criminal plan or mutual conspiratorial objective. Because the Government fails to sufficiently allege a conspiracy between First Kuwaiti and KBR, the Court may not maintain personal jurisdiction over First Kuwaiti on this basis.

### 5. FCA-Specific Considerations

In a theory of personal jurisdiction that seems to fall conceptually between the claim that First Kuwaiti purposefully directed activity at the United States and that First Kuwaiti entered a conspiracy to defraud the United States with a co-conspirator subject to the Court's jurisdiction, the Government argues for jurisdiction on the basis of First Kuwaiti's "intimate involve[ment]" in the preparation and submission of a false claim for payment by the United States. Pl.'s Resp. to Mot. Dismiss 8–9. Because this is a tort and not contract case, the Court must focus on First Kuwaiti's role in the tort and not its contractual contacts with the United States, the Government argues. The Government primarily bases this theory on a D.C. Circuit opinion finding personal

jurisdiction over a foreign subcontractor charged with FCA violations. *See id.* (citing *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.871, 887 (D.C. Cir. 2010)).

Like First Kuwaiti, the subcontractor in *Miller* was based in a foreign country and had no employees, property, or offices in the United States. *Miller*, 608 F.3d at 887. The subcontractor was also not directly a party to the contract with the United States underlying the FCA suit. *Id.* However, the D.C. Circuit found personal jurisdiction over the subcontractor on the grounds that the subcontractor was "intimately involved" with the general contractor's preparation of the allegedly fraudulent bid for that contract; indeed, a subcontractor employee signed the bid tender. *Id.* The subcontractor knew that the United States was the source of its compensation on the subcontract. *Id.* Additionally, the D.C. Circuit noted the district court's undisputed finding that the subcontractor "was created by American citizens, acting as agents for . . . American corporations, for the specific purpose of providing services to companies that were bidding on projects that were going to be funded by agencies of the United States." *Id.* (quoting *Miller v. Holzmann*, No. 95-1231, 2007 WL 39371, at *7–8 (D.D.C. Jan. 8, 2007)). These facts indicated that the subcontractor "should reasonably anticipate being haled into court" in the United States, the court found, and therefore there were sufficient minimum contacts to justify personal jurisdiction. *See id.*

Here, the Government does not allege that First Kuwaiti, even though not in direct contractual privity with the United States, was involved with KBR's bidding for LOGCAP III, or that First Kuwaiti was organized by Americans for the primary purpose of bidding for foreign American contracts. By contrast, First Kuwaiti is merely a party joined to the LOGCAP III enterprise by KBR's unilateral activity. This case therefore lacks allegations of the significant forum contacts and conduct purposefully directed at the United States upon which *Miller* relied.

As discussed, there is also no similar plausible inference of cooperation between First Kuwaiti and KBR in preparing the false claims from which the Government's suit arises. Accordingly, the D.C. Circuit's rationale for finding personal jurisdiction in *Miller* is inapplicable to this suit.

The Government's reliance on another FCA case making the tort-contract distinction, *United States v. Washington Group Int'l*, is similarly unavailing due to the presence there of significant physical contacts between subcontractor and forum, and a shared fraudulent enterprise between contractor and subcontractor to obtain the United States contract. *United States v. Wash. Grp. Int'l*, No. CV04-555, 2006 WL 753231, at *3 (D. Idaho Mar. 22, 2006) (noting allegations that Egyptian subcontractor's employees attended eight meetings in Idaho where the defendants "discussed, planned, and implemented the secret joint venture" and together prepared fraudulent bid materials to obtain a USAID contract).

### 6. Conclusion

As a foreign company conducting projects in foreign territory, First Kuwaiti is connected to the United States Government in this case only through a handful of correspondence, a single action by counsel retained for a specific unrelated purpose, and the independent actions of KBR—and then only to the Government itself and not the jurisdictional United States. KBR has not purposefully directed its activities at this forum, and lacks sufficient contacts to justify the Court in exercising jurisdiction on their basis. Because the Government has additionally failed to plead the existence of a conspiracy between First Kuwaiti and KBR that would make First Kuwaiti derivatively subject to jurisdiction through KBR's American presence, the Court finds that it lacks specific personal jurisdiction over First Kuwaiti. All claims against First Kuwaiti are dismissed.

## II.    OAS's Motion to Dismiss

OAS moves to dismiss on two grounds: (1) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), on the basis of the arguments made by KBR in its Motion to Dismiss, ECF No. 24 and supporting Memorandum, ECF No. 25; and (2) for failure to plead fraud with particularity under Federal Rule of Civil Procedure 9(b), because the Government failed to specify OAS's role in the alleged fraudulent conduct.  OAS Mem. in Supp. Mot. Dismiss 2, ECF No. 61.  For the same reasons the Court rejected KBR's Rule 12(b)(6) argument in its Motion to Dismiss, the Court denies OAS's request to dismiss the Complaint on that basis. *See* Mar. 31, 2014 Order, ECF No. 66.  Accordingly, the Court turns to OAS's Rule 9(b) argument.

### A.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "describe the claim in sufficient detail to give the defendant 'fair notice of what the claim is and the grounds upon which it rests'" and its factual allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  A complaint must include factual content supporting a "reasonable inference" that the defendant committed the conduct alleged.  *Iqbal*, 556 U.S. at 678.

A complaint must also "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) sets the pleading standard for any claim that "sounds in fraud," i.e., that is "premised on a fraudulent course of conduct."  *Perelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co*., 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted).  Claims under the FCA, an antifraud statute, and under the CDA's antifraud

provision therefore must comply with Rule 9(b). *See* 41 U.S.C. § 7103(c)(2); *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 920 (7th Cir. 2009).

Rule 9(b) requires that the party alleging fraud provide the "who, what, when, where and how." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)) (internal quotation marks omitted). Accordingly, the Government must allege (1) the identity of the person who made the misrepresentation, (2) the time, place, and content of the misrepresentation, and (3) the method by which the misrepresentation was communicated to it. *Windy City Metal Fabricators v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008) (citation omitted).

Complaints governed by Rule 9(b) may not "lump together" multiple defendants, but must "inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (internal quotation omitted). Distinguishing defendants' roles is not necessary, however, when such information "is uniquely within the defendant's knowledge," *id.* at 778 n.5 (citation omitted), or when defendants are related corporate entities who can themselves determine their individual roles "without significant difficulty," *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir. 1994). *See, e.g.*, *Duggan v. Terzakis*, 275 F. Supp. 2d 968, 973 (N.D. Ill. 2003) (citing *Jepson* in permitting complaint to lump together roles of defendants who were closely related corporate entities with "substantial overlapping ownership").

### B. Analysis

Regarding OAS, the Government specifically alleges: (1) OAS is a foreign, wholly-owned subsidiary of Kellogg Brown & Root LLC, itself formerly owned by Halliburton

Company; (2) OAS "employed most of KBR's administrators working on LOGCAP III in Iraq and Kuwait" during the period relevant to this case; and (3) until April 2007, OAS's and other KBR entities' employees "were trained using Halliburton's personnel and procedure manuals, received employment benefits through Halliburton's human resources organization, and conducted email correspondence through the Halliburton.com network." Am. Compl. ¶ 5(c). Moreover, the Government specifically includes OAS within its reference to the KBR entities collectively as "KBR." *Id.* ¶ 5. Therefore, all allegations against "KBR" include OAS within their scope.

Failing to distinguish the individual role played by OAS in this way normally lacks the particularity that Rule 9(b) requires. *See Vicom, Inc.*, 20 F.3d at 778. However, the Government's allegations of shared corporate ownership and employee programs support the plausible inference that OAS and Kellogg Brown & Root are closely related corporate entities in a position to determine their roles in the alleged fraud without significant difficulty. *See Jepson, Inc.*, 34 F.3d at 1329; *Duggan*, 275 F. Supp. 2d at 973. Further, in the Complaint, the Government regularly identifies the specific "KBR" administrator responsible for particular statements or transactions substantiating its theory of fraud. *See, e.g.,* Am. Compl. ¶ 76 (discussing allegedly false certification by Senior Manager for Government Compliance Theodore Needham). The Government's allegation that many of these administrators simultaneously worked for both Kellogg Brown & Root and OAS, Am. Compl. ¶ 5(c), supports the inference that Defendants have the best—and, at this preliminary stage, perhaps only—access to the information necessary to determine who was working for whom, and therefore the roles played by each company in making the alleged false claims. *See Vicom, Inc.,* 20 F.3d at 778 n.5.

As the Court previously held, the Government's allegations detail with Rule 9(b) specificity the dates, methods of communication, parties involved, and content of the alleged knowing misrepresentations and fraudulent withholding of material information by "KBR." Mar. 31, 2014 Order 19–20. Because OAS is incorporated in these detailed allegations, and not inexcusably "lumped together" with the other Defendants, the Government's allegations against OAS also meet the Rule 9(b) pleading standard. OAS's Motion to Dismiss is denied.

## CONCLUSION

Defendants' requests for hearings on their motions to dismiss, First Kuwaiti Motion for Hearing, ECF No. 53, and OAS Motion to Dismiss 1, ECF No. 60, are DENIED. First Kuwaiti's Motion for Leave to File a Supplemental Memorandum in Support of its Motion to Dismiss, ECF No. 56, is GRANTED. KBR's Motion for Leave to Respond to United States' Opposition to First Kuwaiti's Motion to Dismiss Complaint, ECF No. 57, is DENIED. First Kuwaiti's Motion to Dismiss, ECF No. 50, is GRANTED, and OAS's Motion to Dismiss, ECF No. 60, is DENIED. All claims against First Kuwaiti are dismissed.


Entered this 30th day of September, 2014.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE
